JOSHUA FINE *et als.*, Respondents, *v.* THE BOARD OF PRESIDENT AND DIRECTORS OF THE ST. LOUIS PUBLIC SCHOOLS *et als.*, Appellants.

1. *Lands and Land Titles— Confirmations — Abandonment.* — The act of Congress of 13th June, 1812, confirming the titles to lots, &c., in the villages named, operated to vest the legal title in the claimants who brought themselves within the provisions of the act by proving cultivation and possession ; subject to be destroyed by proof that the party had abandoned the land with the intention that it should no longer be his. Abandonment is a question of fact to be decided by a jury under the directions of the court.
2. *Lands and Land Titles— Common Field Lots* —Common field lots are narrow lots adjoining to each other, having the same general range and a uniform depth, and used by the inhabitants of the town for cultivation.
3. *Ejectment— Practice—Remittitur— Supreme Court.*—When the verdict and judgment in ejectment includes lands to which the plaintiff is not entitled, he may enter a *remittitur* in the Supreme Court, and have the proper judgment entered where no inquiry into extrinsic facts is necessary.

### Appeal from St. Louis Circuit Court.

This was an action of ejectment for the recovery of five undivided fourteenth parts of a lot of land of one by forty arpents in the St. Louis commons field, bounded on the north by survey No. 1483 to Joseph Taillon, and on the south by survey No. 1482 to Jean B. Sarpy's representatives. The case had been previously in the Supreme Court—23 Mo. 570, & 30 Mo. 166.

At the trial of the cause, plaintiffs read in evidence the depositions of Antonio Smith, Francis Noisé, Joseph S. Hull, Elizabeth Ortes, and Joseph Aubuchon, for the purpose of showing that Philip Fine, under whom plaintiffs claim title, cultivated the land in controversy prior to December, 1803. The evidence adduced by plaintiffs tended to show that, prior to 1782, one Laurent Larouge, *alias* Philibert Gagnon, fenced in and claimed a tract of land near the "Big mound" corresponding somewhat in its description with the land in controversy; that after his death his widow Madame Larouge, claimed the land; that she married Philip Fine in 1782; that Fine cultivated the land between 1782 and 1791; that about the year 1793, when the common fence fell down, he married his second wife, Celeste Boly, and removed to the Maramec, where he had cultivated a farm ever since 1783. It appeared in evidence that the land in controversy remained vacant until 1839 (46 years); that in 1839 Robert N. Moore took possession of a portion of said tract, claiming the same under Fine; that in 1845 all the land in controversy, except that portion which is covered by Labeaume's survey, was assigned and surveyed for the Public Schools as vacant lands under the acts of 1812 & 1824; that after some litigation the defendants acquird the possession of the premises in controversy, and have ever since continued to hold and claim the property adversely to the plaintiffs who claimed under Fine.

The defendants then read in evidence two assignments for the support of the Schools in the town of St. Louis, being land included in U. S. surveys Nos. 379 and 380, embracing so much of the land in controversy as is not covered by Labeaume's survey.

The defendants, for the purpose of proving that the land in controversy was vacant, abandoned, and united to the public domain, prior to Dec. 20, 1803, then read in evidence the certified copies of the proceedings and entries on the margin of Livre Terrein, under the Spanish Government, relating to all lots in that part of the common field (in which the prem-

ises in controversy are situated) as lie north of the premises. The proceedings so read tended to show that in and about the year 1793 (being the time when Fine removed to the Meramec) nearly all the lots adjoining the lots in controversy had been abandoned for many years by the persons who claimed or cultivated them, and were marked on Livre Terrein, "reunited to the public domain."

The defendants then read in evidence certified copies of the petition of Joseph Brazeau, Louis Labeaume, and Pierre Chouteau, to the Lieutenant Governor under the Spanish Government, and certified copies of the concessions of the Lieutenant Governor to Brazeau, Chouteau and Labeaume, and papers accompanying the same. In these petitions, and the proceedings had thereon between the years 1794 and 1803, the land in controversy was spoken of, and treated as vacant and abandoned.

The defendants gave in evidence a plat marked B., proved by Adolph Renard that he was keeper of the surveys of Martin Duralde ; that Duralde was a surveyor under the Spanish Government; that Duralde made the surveys represented on said plat between the years 1770 and 1772; that the endorsements of abandonment were made in 1793–4; that the plat is a correct connected plat of the surveys of Duralde on file in the office of witness, and that Martin Duralde died many years ago.

The defendants then read in evidence the certified copies of the petition of Philip Fine to the Lieutenant Governor under the Spanish Government for land at or near the mouth of the Meramec, and the concession of the Lieutenant Governor. The documents tended to prove that from 1786 to 1799 Philip Fine cultivated and possessed a tract of land at the mouth of the river Meramec.

The defendants then read in evidence a marriage contract, dated September 4, 1794, between Philip Fine and Celeste Boly, which contains the following clauses : "The said future couple take each other with all the rights and property to them now belonging and which may accrue to them by in-

heritance, legacy, or otherwise, from whatever side and line the same may proceed, and in whatever place it may be situated, which property shall enter without any reservations into the community, to date from the day of the celebration of said marriage." "The said future couple, in order to give each other a reciprocal proof of the mutual affection they entertain towards each other, have made each to the other, as they do make by these presents, a donation *inter vivos*, mutual and reciprocal and indefeasible, to the survivor of them, all the personal and real property which the first one dying shall have and leave at the day and hour of his or her death, for the survivor to have, manage and dispose of in full right, and as the property to him belonging, without the said survivor being held to any inventory or renditions of account towards the parents or heirs of the first one dying, which shall belong to the said survivor of full right."

The defendants then proved by official records that Philip Fine married his first wife, Madame Larouge, on the 23d of November, 1782; that Madame Larouge died on the 25th of October, 1791; that Philip Fine married his second wife, Celeste Boly, on the 9th of September, 1794; that Francis Noisé, the witness examined on behalf of plaintiffs, was baptized on the 28th of March, 1785, three years after the marriage of Fine and Madame Larouge.

The defendant then introduced the testimony of P. Chouteau, Jr., of William Boly (a brother-in-law of Philip Fine), and of John Pourcelli, tending to show that Philip Fine removed to the Meramec in 1794, and that he never owned, claimed, possessed or cultivated any lot near the Big mound.

The plaintiffs also read in evidence a conveyance dated March 17, 1792, executed by Juan Cuno to Philip Fine, conveying to him a lot of ground on Main street in the town of St. Louis. In this conveyance Philip Fine is mentioned as having been present in St. Louis in 1792.

Plaintiffs' instructions given:

1. If the jury believe from the evidence that the lot de-

scribed in the petition was one of a series of lots lying adjoining each other, and having the same general range and uniform depth of forty arpents; and that Philip Fine, prior to December 20, 1803, cultivated this lot in different parts thereof, claiming the whole, and while so cultivating it was an inhabitant of the then town or village of St. Louis, and that he was the last cultivator thereof before December 20, 1803, and continued to claim the same until the 13th day of June, 1812, they should find for plaintiffs.

2. If the jury believe from the evidence that Philip Fine did cultivate the lot in controversy as above stated, they should presume that he rightfully claimed it, and always afterwards claimed it, until the contrary be proven.

3. If the jury find that Philip Fine did cultivate said lot as mentioned in the 1st instruction—then they are instructed that they ought not to find that Philip Fine abandoned the lot in controversy unless they find that he in his lifetime left the lot and ceased to exercise ownership and control over the same with the intent on his part that the said lot should no longer be his property.

Defendants' instructions given:

1. By abandonment is meant the quitting of possession of land with the intention that it should be no longer the property of the possessor. The intention of abandonment may be inferred or presumed by the jury from all of the facts and circumstances of the case; if, therefore, the jury should believe from the evidence that Philip Fine inhabited, possessed or cultivated the land in controversy prior to December 20, 1803, but should also believe from all of the facts and circumstances given in evidence in this case that he abandoned the same at any time prior to June 13, 1812, they will find for defendants.

2. If the jury are not satisfied from the evidence that Philip Fine inhabited, possessed or cultivated the land in controversy in his own right prior to December 20, 1803, they will find for the defendants.

3. If the plaintiffs have not proved to the satisfaction of the jury the extent and boundaries of the land which they allege was inhabited, possessed or cultivated by Philip Fine prior to December 20, 1803, they cannot recover in this action.

4. Unless the jury shall be able from the evidence satisfactorily to ascertain and fix the location and boundaries of the lots of land alleged to have been cultivated and possessed by Philip Fine on the 20th day of December, 1803, and to identify said lot as being the same land now sued for in this case, they will find for the defendants.

5. The jury are instructed that the United States surveys 1482 and 1483 are not conclusive but only *prima facie* evidence of the location and boundaries of the respective lands therein described, so far as said surveys affect defendants in this suit.

Defendants' instructions refused:

1. The plaintiffs cannot recover in this action if the jury believe from the evidence that Madame Larouge inhabited, cultivated or possessed the land in controversy prior to December 20, 1803, and that after her death her second husband succeeded her in the possession of said land as a part of the estate of Madame Larouge.

2. In order for the plaintiffs to recover in this action they must not only prove to the satisfaction of the jury that the land in controversy was inhabited, possessed or cultivated by Philip Fine in his own right prior to December 20, 1803, but that his right, title or claim thereto (if he ever had any) existed at the time of the passage of the act of Congress of June 13, 1812.

3. The possession of land by a widow after the death of her husband is presumed, in the absence of any proof to the contrary, to be a possession for the legal representatives of the deceased husband; if, therefore, the jury believe from the evidence that Laurent Larouge inhabited, cultivated or possessed the land in controversy prior to December 20,

1803, and that after his death his widow, Madame Larouge, and her second husband, Philip Fine, succeeded him the said Laurent in the possession of said land, holding the same as a part of the estate of said Laurent, the plaintiffs cannot recover in this action, inasmuch as no proof has been offered to show who are the legal representatives of said Laurent.

4. If the jury believe from the evidence that Philip Fine inhabited, possessed or cultivated the land in controversy prior to December 20, 1803, but before or about the year 1803 left said land and forever thereafter ceased to inhabit, cultivate or possess the same, or to exercise any acts of ownership over the same, then and in that case the act of Congress of June 13, 1812, did not confirm said land to said Fine, and the plaintiffs cannot therefore recover in this action.

5. Under the evidence the plaintiffs cannot recover in this action, and the jury are therefore instructed to find for the defendants.

*E. Casselberry*, *N. Holmes*, *Jas. Taussig*, and *S. A. Holmes*, for appellants.

*Krum* and *Lackland*, for respondents.

WAGNER, Judge, delivered the opinion of the court.

The plaintiffs in this case have had three verdicts; it has been twice before in this court, and each time reversed and remanded, either because the court below rejected competent and legitimate testimony, or because improper instructions were given. Upon the last trial all the evidence was admitted by the court offered by the defendants, tending to support their view of the case, and it is not seriously contended that any evidence was admitted on behalf of plaintiffs which was illegal, or operated to defendants' injury.

Several points have been urged by defendants' counsel for a reversal, but it is unnecessary to bestow any particular attention on them, as the essential merits of the whole controversy are involved in one question—that is, abandonment.

Upon this the parties must stand or fall. If Fine, the elder, abandoned the premises, so that they were susceptible of being reunited to the public domain according to the Spanish custom, then the assignment to the Public Schools in 1845 presents a title valid and incontestable. But if there was no abandonment, then the claims of the Public Schools must give way, and be held inferior to the prior claims.

The act of June 13, 1812, (2 U. S. Stat. at large, 748) entitled "An act for the settlement of land claims in Missouri," confirmed the rights, titles and claims to town or village lots, out-lots, common field lots and commons in, adjoining and belonging to the several towns and villages therein named, (including St. Louis,) which lots had been inhabited, cultivated or possessed prior to the 20th of December, 1803. And it has been uniformly held by both the courts of this State and of the United States that this act operated *proprio vigore*, and that when the facts of inhabitation, cultivation or possession were shown prior to December, 1803, they amounted to an absolute confirmation, without any evidence that the confirmee had received any grant, or survey, or permission to cultivate from the Spanish Government—Soulard v. Clark, 19 Mo. 570; Guitard v. Stoddard, 16 How. (U. S.) 494. Proof of inhabitation, cultivation or possession previous to 20th December, 1803, vests the title in the person adducing this evidence, subject to be destroyed by showing that the party abandoned the land and removed from it, with the intention that it should no longer be his.

When this case was here before, the court said: "The Spanish law on the subject of abandonment declares that if a man be dissatisfied with his immovable estate and abandon it, immediately he departs from it corporeally, with an intention that it shall no longer be his, it will become the property of him who first enters thereon—1 Partidas, Law, 50, p. 365. Abandonment is a question for the consideration of the jury, and depends upon the intention which is to be ascertained from circumstances—Fine v. Public Schools, 30

Mo. 166; Landis v. Perkins, 12 Mo. 257; Barada v. Blumenthal, 20 Mo. 162. The question was again reviewed in this court in Clark v. Hammerle, 36 Mo. 520, and the doctrine of the above cases affirmed. Abandonment is thus merely a question of fact for the consideration of the jury, and if the court did not misdirect them their verdict must prevail.

What is an out-lot, or common field lot, is for the court to decide, and the first instruction given for the plaintiffs presents a sufficiently correct designation, and appears to us unobjectionable.

The second and third instructions given for plaintiffs, taken in connection with the first and second instructions given at the instance of the defendants, seem to embody the law fairly on the subject of abandonment. The remaining three instructions prayed for by defendants and given by the court, cast the onus of proof entirely on the plaintiffs of identifying the land and fixing the location of the boundaries, and, taken altogether as a whole, presented the law fully and correctly; and whether there was an inhabitation, cultivation or possession of this land by Fine prior to December, 1803, or whether he abandoned it so as to lose all right or title to it, were purely questions for the jury, and were properly submitted to them by the court.

We see no error in refusing the instructions asked by the defendants numbered 1, 2, 3, 4 and 5. The first instruction was not supported by the evidence and was inapplicable to the case. The second related to the subject of inhabitation, cultivation, possession and abandonment, and had previously been given at the instance of both parties. The third was erroneous, under the evidence in the case, showing a survivorship growing out of the marriage contract; nor is it law, according to the facts which must govern this case. The fourth instruction was wrong, because it singled out certain facts, and told the jury that, if they were true, they should find for the defendants, when there were other facts in the case bearing on the same subject. It amounted to a commentary on the evidence, giving particular facts undue

importance, and moreover asserted a proposition of law directly opposed to the doctrine laid down in Page v. Scheibel and Clarke v. Hammerle. The fifth instruction undertook to withdraw the whole case from the jury, which is never permissible when the plaintiff has given any testimony conducing to prove his allegations.

United States survey 3333 to Louis Labeaume constitutes an interference in this tract, and includes within it some seven or eight arpents which originally belonged to the land now in controversy. On the trial plaintiffs disclaimed owning any right, title or interest within the survey 3333 to Labeaume, but the judgment was rendered for the whole land. The plaintiffs have now filed a *remittitur* in this court, remitting so much of the finding and verdict of the jury in the court below as includes any part of the land embraced in the United States survey No. 3333, and also remits all damages and monthly-values.

This is objected to by defendants, and Fenwick v. Gill, 34 Mo. 194, cited as an authority in opposition to this practice. In that case the only reason assigned for refusing the motion was that if the court undertook to modify the judgment, it would be necessary also to apportion the damages and monthly value of the premises, and the record did not furnish any means of making a just and accurate apportionment. The same question cannot operate or have any controlling force in this case, for the damages and monthly value are remitted *in toto*, and no apportionment becomes necessary.

Where the judgment could not be rendered without the application of extrinsic facts, not furnished by the record, of course this court would not proceed to give judgment, but would remit the record to the lower courts for that purpose.

But here the map which is made part of the record furnishes the requisite evidence, by which a correct judgment may be rendered, and we therefore see no reasonable ground for abstaining from such a course.

The judgment of the Circuit Court will therefore be reversed, and judgment will be rendered in this court for the

three twenty-eighth parts of the land, the same as rendered in the judgment of the court below, except that part included in United States survey No. 3333 to Louis Labeaume.

Judge Fagg concurs; Judge Holmes not sitting, having been of counsel.