THE STATE ex inf. ELLIOTT W. MAJOR, Attorney-General, v. ROY C. WOODS et al.

In Banc, March 21, 1911.

1. **INCORPORATING CITY: Petition: No Reference to Commons.** A petition presented to the county court praying for the incorporation of a town, is fatally defective, in a direct attack upon the validity of the attempted incorporation, if it omits all reference to the "commons appertaining to such city or town." The word "commons" as used in the statute (Sec. 8529, R. S. 1909) does not mean the thing called and known as "common" in the days of French and Spanish rule in the Mississippi Valley, but is a part of recently enacted law, and includes parks and pleasure grounds, squares and other grounds set apart for municipal or public purposes in villages, towns or cities. If there are no commons the petition should so state, and if there are they should be described therein by metes and bounds.

2. ———: ———: ———: **Inferior Court.** A county court is a court of inferior and limited jurisdiction, and where the statute prescribes what the petition for the incorporation of a town shall contain, that prescription is preclusive and mandatory, and without a strict compliance therewith the court is without jurisdiction to make an order incorporating the city.

3. ———: ———: ———: ———: **Presumptions: Direct Attack.** An information, *ex officio*, by the Attorney-General, in the nature of *quo warranto*, to oust a city of its franchises, on the ground that it has not been legally incorporated, is a direct attack; and upon a direct attack presumptions are not indulged to support or supply the jurisdiction of a court of inferior and limited jurisdiction, but its jurisdiction must affirmatively appear on the face of its proceedings.

4. ———: ———: ———: *Existence: Judicial Notice.* The existence or non-existence of a commons in a town, seeking incorporation, is not a matter of which courts will take judicial notice, but one of allegation and proof; and the statute contemplates that the record of incorporation should show the fact.

5. ———: ———: ———: **Matter of Public Interest.** The municipal preservation and control of commons within a city —such as parks, squares, wharfs or other public grounds— are objects of solicitude to the lawmaker, and should be provided for in the petition and judgment for the incorporation of the town. They are not mere sentimental conceits. They are useful elements in wholesome municipal life, well worthy the attention of laws and courts.

6. ———: **Fraud: Available in Quo Warranto.** Fraud is a subject of inquiry in *quo warranto* to test the validity of a judgment of the county court incorporating a town.

7. ———: ———: **Judges as Witnesses.** Objections to judges of the county court testifying to facts impeaching the judgment of their court incorporating a town, and tending to show it was concocted in fraud, should be made at the time their testimony is offered, and unless that is done it will not be held that they were improperly permitted to testify.

8. ———: ———: **No Ascertainment of Number of Inhabitants.** Taking the allegations of the petition for, and of the remonstrance against, the incorporation of a town to be true, without any effort to ascertain by legal proof that a majority of the taxable inhabitants of the town have signed the petition, together with a recital in the judgment that the court had satisfied itself that a majority of such inhabitants had signed such petition, is a legal fraud—a fraud on the law and orderly procedure—even though there be no criminality, corruption or any form of moral turpitude.

9. ———: **Quo Warranto: Necessary Parties.** The officers of a town whose incorporation is challenged by *quo warranto* by the Attorney-General are the proper parties defendant, and the town is not. [WOODSON, J., dissenting.]

## Quo Warranto.

WRIT OF OUSTER GRANTED.

*Elliott W. Major,* Attorney-General, *Wm. R. Gentry* and *Johnson, Houts, Marlatt* & *Hawes* for informant.

(1) *Quo warranto* is a proper proceeding to determine the question of the legality of the organization of a municipal corporation. 32 Cyc. 1424; High's Extraordinary Legal Rem., sec. 695. In such proceedings the court is not limited to an examination of the record but may inquire into the facts upon which the jurisdiction of the court is founded. State ex rel. v. Coffey, 59 Mo. 59; State ex rel. v. McReynolds, 61 Mo. 203; State ex inf. v. Bellflower, 129 Mo. App. 138; State ex rel. v. Fleming, 147 Mo. 1. And in a *quo warranto* proceeding the court may determine whether or not the order of incorporation was obtained by fraud by the court, or fraud practiced upon the court. State ex rel. v. Fleming, 147 Mo. 1; State ex rel. v. Fleming, 158 Mo. 562; State ex rel. v. Job, 205 Mo. 1; 32 Cyc. 1424. (2) The order of the county court incorporating the city of Wellston was void: (a) Because the petitions for incorporation did not describe the commons appertaining to the proposed city, nor did they allege that there were no commons. The statute requires that the petition shall describe the commons of the proposed incorporated city. The jurisdiction of the court depends upon a statutory petition having been filed. All jurisdictional facts must affirmatively appear upon the face of the proceedings and no presumptions are indulged as to matters not so appearing. State ex rel. v. Metzer, 26 Mo. 65; State ex rel. v. Page, 107 Mo. App. 213; State ex rel. v. Heege, 37 Mo. App. 338; State ex rel. v. County Court, 66 Mo. App. 96; State ex rel. v. Higgins, 71 Mo. App. 180; State ex rel. v. Seibert, 97 Mo. App. 212; State ex rel. v. Wilson, 216 Mo. 277. (b) Because the order of incorporation shows that it is founded upon two petitions, one filed on May 3, 1909, and the other filed on May 26, 1909. The statute em-

powers the county court to act upon "a petition," not upon a number of petitions filed at different times. R. S. 1909, sec. 8529. (3) The action of the county court in causing its records to recite that the court had found that more than a majority of the taxable inhabitants of the proposed town of Wellston had signed the petitions for incorporation, when, as a matter of fact, the court at the time knew that they had not in truth found any such fact, and when the court knew that they had no evidence before them upon which they could make such finding, constitutes a fraud upon the law and upon the people affected thereby, and such fraud invalidates the order of incorporation. Burkharth v. Stephens, 117 Mo. App. 425; Baldwin v. Davidson, 139 Mo. 118. (4) The judges themselves were competent witnesses to prove the facts showing fraud. Pulliam v. Pensoneau, 36 Ill. 374; Taylor v. Larken, 12 Mo. 103; Garrett v. Stacy, 17 Mo. 601; Baker v. Lane, 137 Mo. 682; State ex rel. v. Breen, 85 Pac. 870; Black v. Miller, 75 Mich. 323; Wood v. Fout, 55 Mich. 185; Rodgers v. Manderville, 200 Ga. 727. But even if the judges were not competent to establish these facts, since the respondents interposed no objection at the trial, they will not now be heard to object. Ladd v. Williams, 79 S. W. 511; Mann v. Balfour, 187 Mo. 290; Fry v. Railroad, 200 Mo. 406.

*J. C. Kiskaddon, B. L. Matthews* and *M. F. Farrow* for respondents.

(1) The finding of the special commissioner in any case is not at all conclusive. It is merely advisory. It is the province and duty of the court to examine the law and the facts and correct any error the commissioner may have committed. State ex rel. v. Jenkins, 25 Mo. App. 484; State ex rel. v. Fleming, 147 Mo. 1; State ex rel. v. Fleming, 158 Mo. 558; State ex rel. v. Weithaupt, 231 Mo. 449; Hall v. DeArmond, 46 Mo.

App. 596. (2) The petitions for incorporation do not mention commons. This defect the special commissioner considers fatal. The answer and return alleges that Wellston has no commons appertaining to it, but there is no evidence on that point. If no commons appertain to a city seeking incorporation why mention commons at all? The petitioners are only required to mention commons if any appertain thereto. After all it may be a question what the statute means by commons. The commissioner cites a number of authorities, all of which show that at various times persons have dedicated to public use tracts of land by the name of *commons* and the cases cited by him show that the question before the court was what the donors in each particular case meant by the use of that word. The commissioner rightly holds that such commons are not common-law commons, but wholly ignores the fact that there might be some other kind of commons, and that the statute might mean some other kind. We discover on investigation that the word commons has been used in several senses, to-wit: 1, colloquially; 2, common-law commons; 3, civil-law commons. The authorities cited by the commissioner, and upon which he bases his finding, treat of the first class. Parties dedicated within the boundaries of a municipal corporation tracts of land to public use by the name of *commons*. An ordinary colloquial use applies the word *commons* to any public square or plat of land in a town. Even uninclosed vacant lots and blocks, although the property of a private individual, are frequently called commons. It is obvious that streets, alleys and public squares within the territory to be incorporated could have no special regulation or preservation by any order the county court could make, but in the case of a city of the third class would be regulated by the governing body of the city under the

statutes conferring municipal powers. It would there-
fore be obviously idle to allege or ask any regulation of
any such alleys, streets or public squares in the pro-
posed municipality, and impracticable to set out their
metes and bounds. But if it can be ascertained that
the statute prescribing that a proposed corporation
should in its petition for incorporation set out the
metes and bounds of its commons and ask for their
regulation, once applied to a condition of affairs in this
State which has wholly ceased to exist, then the cases
cited by the commissioner have no application what-
ever. Common-law commons are defined as follows:
Common is an incorporeal hereditament; being a profit
which a man hath in the land of another; as to feed his
beasts, to catch fish, to dig turf, to cut wood, or the
like; and hence common is chiefly of four sorts: com-
mon of pasture, of piscary, of turbary or of estover.
2 Black. Com. 32. It is obvious that such common does
not include streets, alleys, public squares, etc., because
such public places would not be ''a profit a man hath''
in the land of anybody, but would be for the general
use of the public, whether residents of the corporation
or not. In fact, common-law commons never existed in
Missouri. But it may be said that one might dedicate
land within the boundaries of a municipal corporation
for a restricted public use, i. e., a park. But this would
not be a common-law common, and its regulation
would depend wholly on the act of dedication and the
statutes governing the powers of municipality. No
judgment of the county court could add or detract
anything providing for its regulation. But there did
once exist within the boundaries of what is now the
State of Missouri a species of commons, which
was the creation of the civil law. There are numerous
decisions in the early reports of the Supreme Court
of this State treating of titles derived from the
sale of that kind of commons, but lawyers and courts
in this State seem to have been so familiar with

this kind of commons that they took no trouble to, define just what these commons were. The following Missouri cases may afford some light on the subject: Harrison v. Page, 16 Mo. 182; Fair v. Pub. Schools, 39 Mo. 59. In the case of Choteau v. Eckert, 43 U. S. 344, decided in 1844, the nature of this kind of commons is clearly explained. Five years after the cession of sovereignty of France to the United States the legislative body, consisting of the Governor and judges of the District of Louisiana (1 Ter. Laws, 6), passed an act, approved June 8, 1808, by which villages in the district were given the power to incorporate. 1 Ter. Laws, 184. The first section of that act required, that, to incorporate, the village should set forth the metes and bounds of its commons and pray for a police and "for the regulation and preservation of any commons appertaining thereto." It is obvious that this act, by the use of that language, did not refer to the streets, alleys, public squares or parks, which were within the boundaries of the proposed municipal corporation, but only to the "commons" as heretofore defined, which were outside of such boundaries. This act of 1808 has been continued in our statutes without change of language from that time to the present. 2 R. S. 1825, p. 764; R. S. 1835, p. 600; R. S. 1845, p. 1048; 1 R. S. 1855, p. 1524; G. S. 1865, p. 240; 2 R. S. 1879, p. 868; 1 R. S. 1889, p. 304; 2 R. S. 1899, p. 1224; R. S. 1909, sec. 8529. The inclusion of a prior statute in a subsequent revision adds nothing to its force. It is to be deemed a mere continuance of the first act. Strattman v. St. Louis, 211 Mo. 227. The intent of a statute must be found to ascertain its meaning, and for that purpose the circumstances existing contemporary with its passage should be taken into consideration. Keeny v. McVey, 206 Mo. 65; State v. Gmelich, 208 Mo. 159; Henry County v. Salmon, 201 Mo. 161; 23 Am. & Eng. Ency. Law (1 Ed.), 336. Bear in mind that the original Act of 1808

contemplated the incorporation of the densely inhabited part of the village. That densely inhabited part was to be taken within the limits of the incorporated village, but the commons, out lots, etc., were outside of those limits and the regulation of those were by the incorporation transferred from the syndic who had exercised control under the French government to the governing body of the newly established municipality. These commons, out lots, etc., might be even detached from the boundary of the actual municipality by intervening lands. The streets, alleys, public squares, etc., within the boundaries of the municipality needed no other regulation than that given by the act, which is the charter, and the general powers conferred thereby. June 13, 1812, four years after the aforesaid Act of 1808, Congress passed an act confirming to named villages their commons. 2 Stat. at Large, 748. The villages named are as follows: Portage des Sioux, St. Charles, St. Louis, St. Ferdinand, Village a Robert, Carondelet, Ste. Genevieve, New Madrid, New Bourbon, Little Prairie and Arkansas. Of these villages, Little Prairie and Arkansas are within the present boundaries of the State of Arkansas. Village a Robert is now the town of Bridgton in St. Louis county. This enumeration of villages indicates all the villages that had commons of the kind that this Act of 1808 contemplated. By subsequent acts of the Legislature of Missouri these commons have ceased to exist as such and have passed into the hands of private proprietors. 2 Ter. Laws, p. 296; 2 Ter. Laws, p. 501; Laws 1836-7, p. 35; 2 Ter. Laws, p. 393; Laws 1838-9, p. 211; Laws 1842-3, p. 380; Laws 1852, p. 34. By the act of June 18, 1808, New Bourbon became a part of Ste. Genevieve. 1 Ter. Laws, pp. 184, 187, sec. 8. The commons of Ste. Genevieve were incorporated by an act approved Dec. 14, 1822, by which the proprietors of said commons, including the commons of New Bourbon, became a corporation, distinct and separate from the

town of Ste. Genevieve. We are informed that this corporation still exists and is now the only instance in Missouri where the old French commons are held in any other manner than by private holders in fee, whose title is derived from the sale of commons by the villages named. It will be noted from all these acts authorizing these villages to dispose of their commons that these villages had all been incorporated, either by special acts or under the general law. Being municipal corporations, the county court would have no jurisdiction to incorporate them again, even if these villages wanted to change from their present corporate existence to one of the classes under the present general law. This they could do of themselves at an election called for that purpose. The county court has jurisdiction to incorporate only where there has never been any corporation before. R. S. 1899, sec. 5257. While such commons existed in this State the Statute of 1808 was a vital thing, but since December 23, 1852, at which time the village of Portage des Sioux was empowered to sell its commons, the Statute of 1808, continued down to the present time, has been a dead letter. Laws 1852, p. 34. It is a fact known in the history of Missouri that the Act of Congress of 1812 confirmed the title to the commons of all villages in Missouri having commons. Courts will take judicial notice of all general historical facts. 12 Am. & Eng. Ency. Law (1 Ed.), 177. Now it may be that if one of the villages to which commons were confirmed by that act made application to a county court for incorporation it would be proper for petitioners to say that the commons had been disposed of, but is it necessary for a village that is not so named in that act to do so? Technically speaking, an allegation that no commons appertained thereto would not comply with the statute, because the statute requires the metes and bounds of commons to be set forth, and to pray for the regulation and preservation of any ap-

pertaining thereto, and to literally comply with the statute, as the commissioner holds we must, we would be compelled to set forth the metes and bounds of a non-existent thing and ask for its regulation and preservation. In the present case will such an absurd doctrine be admitted to deprive the county court of its jurisdiction? Bear in mind that the petition is only to pray for the "regulation and preservation of any commons appertaining thereto." If it does not so pray is the county court to be deprived of jurisdiction? Ought not the county court, if no such prayer is made conclude that no commons appertain thereto? While the non-use of a law does not repeal it, yet if the object or thing to which it applies has ceased to exist, then the reason for it has ceased to exist. Under such circumstances, the thing having ceased to exist, and with it the reason for the law, can the law, utterly impossible of application, be invoked to deprive a court of jurisdiction when all other essential requirements of the statute are complied with? To make such application would make the dead law nullify the vital part of the law; that is, the part of the law now applicable to present circumstances. James v. Com., 12 Ser. & R. (Pa.) 220; Watson v. Blaylock, 2 Mills (S. C.) 351; Williams v. Bacot, 1 Bay (S. C.) 62. The Commissioner erred in holding the county court had no jurisdiction to render a judgment incorporating the city of Wellston. (3) The order of a county court incorporating a city is a judgment of a court of record having exclusive jurisdiction of that subject-matter. In rendering the judgment the court acted judicially and not in an executive or ministerial capacity. See authorities cited under 1. (4) *Quo warranto* is an action at law and not a suit in equity. State v. Alt, 26 Mo. App. 674; People v. Railroad, 57 N. Y. 171; Atty. Gen. v. Ins. Co., 2 Johns. Ch. (N. Y.) 370. (5) The judgment of a court of competent jurisdiction, under which judgment the respondents claim to act as officers of Wellston,

cannot be attacked in a proceeding by *quo warranto* for fraud. State ex rel. v. Ford Co., 12 Kas. 441; State ex rel. v. Uridel, 37 Neb. 371. (6) Because it has another adequate remedy *quo warranto* will not lie. *Quo warranto* will in no case lie if the party has any other remedy, either in law or in equity. High, Ex. Rem. (3 Ed.), sec. 617; People v. Whitcomb, 55 Ill. 177; People v. Koerner, 21 Ill. 65; State v. Wilson, 30 Kas. 675; Malone v. Railroad, 83 N. E. (Mass.) 408; State v. Scott, 70 Neb. 685; Com. v. Bridge, 20 Pa. St. 185; Snowball v. People, 147 Ill., 260. Courts of equity have from time immemorial entertained bills in the nature of informations in equity where the interests of the public were concerned at the instance of law officers of the Crown or State, or by such law officer at the relation of a private party having an interest. Sto. Eq. Plead. (10 Ed.), secs. 8, 49; United States ex rel. v. Company, 26 Fed. 114; State ex rel. v. Bridge Co., 13 How. (U. S.) 562; Atty. Gen. v. Jamaica, 133 Mass. 363; Atty. Gen. v. Evart, 34 Mich. 472; United States v. San Jacinto, 125 U. S. 273; United States v. Beebe, 127 U. S. 338; 3 Pom. Eq. Jur. (3 Ed.), sec. 1096; 5 Pom. Eq. Jur. (3 Ed.), sec. 302; Atty. Gen. v. Railroad, 35 Wis. 425. (7) To set aside a judgment by suit in equity on the ground of fraud it must appear that there was fraud in the very concoction of the judgment. That is, that the judge rendering it was willfully corrupt, or that he was by others knowingly and willfully misled. No error or mistake on the part of the judge is admissible to avoid the judgment. And even where the judgment is procured by means of perjured testimony, forged documents, concealment of facts, etc., yet it cannot be set aside. It is considered the lesser of two evils to allow such a judgment to stand than to adopt a rule which would leave everything unsettled. Burkhardt v. Stevens, 117 Mo. App. 524; Dorman v. Hall, 124 Mo. App. 9; Evart v. Lumber Co., 193 Mo. 451; Railroad v. Merrielies, 182 Mo.

126; Hamilton v. McLeon, 139 Mo. 685; Fears v. Riley, 148 Mo. 58.

LAMM, J.—At its May term, 1909, the county court of St. Louis county incorporates Wellston as a city of the third class, proceeding under Revised Statutes 1909, section 8529, and designates its first officers.

In January, 1910, Mr. Attorney-General exhibits here an information, *ex officio,* in the nature of *quo warranto,* to oust respondents as such officers. Respondents (mayor, marshall, attorney, police judge, assessor, collector, treasurer, and councilmen of said city) enter their appearance and make return. Thereafter we appoint Jesse C. Hargus, Esq., of the St. Clair bar, our special commissioner with donation of power to take testimony and report findings of fact and conclusions of law, together with such testimony. Thereafter Commissioner Hargus qualifies, hears the cause, and in September reports—finding for relator and recommending that judgment of ouster go, on the the ground the judgment of incorporation is void for fraud and want of jurisdiction. Thereafter respondents file exceptions and the cause is finally submitted in January, 1911, on report, testimony, exceptions, briefs and oral argument.

Our learned Attorney-General's information is not assailed by respondents in matter of form or substance; therefore it need not be reproduced. It is full enough in allegation to justify all the offered proofs on each issue raised. The cause proceeds on the theory that the sole right of respondents to act as officers of Wellston is based on its incorporation by the county court. If that incorporation is valid, they are not usurping official authority—otherwise, otherwise. The information, *inter alia,* charges the incorporation is void (1) because of lack of jurisdiction in the county court (and herein of the incorporating petition not

stating facts sufficient to constitute a cause of action);
and (2) because of fraud. Respondents' return
traverses those allegations. The forensic controversy
is pitched on that line and there the adversary parties
go up to battle.

The material part of the statute in judgment (Sec.
8529, R. S. 1909) reads: "Any city or town of the State
not incorporated may become a city of the class to
which its population would entitle it under this article,
and be incorporated under the law for the government
of cities of that class, in the following manner: When-
ever a majority of the inhabitants of any such city or
town shall present a petition to the county court of the
county in which such city or town is situated, setting
forth the metes and bounds of their city or town and
commons, and praying that they may be incorporated,
and a police established for their local government,
and for the preservation and regulation of any com-
mons appertaining to such city or town, and if the
court shall be satisfied that a majority of the taxable
inhabitants of such town have signed such petition, the
court shall declare such city or town incorporated, des-
ignating in such order the metes and bounds thereof,
and thenceforth the inhabitants within such bounds
shall be a body politic and incorporate, by the name
and style of 'The City of ——,' or 'The Town of ——;'
and the first officers of such city or town shall be de-
signated by the order of the court, who shall hold their
offices until the first general election of officers, as pro-
vided by law, and until their successors shall be duly
elected and qualified."

The vital part of the challenged incorporating pe-
tition reads:

"*To the Honorable County Court of St. Louis
County and to the Honorable Judges thereof.*

"The undersigned are taxable inhabitants of that
part of the county of St. Louis defined in the accom-

233 Sup.—24

panying map as the proposed 'Wellston', and the general description of the metes and bounds thereof is as follows:'' (description omitted.) -

"As taxable inhabitants of the aforesaid territory indicated by said map and description as that of the proposed city to be called 'Wellston' your petitioners pray that they may be incorporated, and a police established for their local government, and that the inhabitants of said described territory may be so incorporated as a city of the third class under the general laws of the State of Missouri by the name of Wellston, included therein the territory hereinbefore described and the inhabitants thereof.

"Said territory of said proposed city is entirely within the county of St. Louis, Missouri, and within the jurisdiction of your Honorable Court, and your petitioners further respectfully state:

"1.   That the said territory within which your petitioners reside (and the inhabitants whereof it is hereby proposed to incorporate as a city) in said county of St. Louis is not at present within the limits of any town, city or village, and said territory includes more than three thousand and less than thirty thousand inhabitants.

"2.   That the name of the proposed city is 'Wellston.'

"3.   That your petitioners (at the time this petition is submitted to this court) comprise in number more than a majority of the taxable inhabitants of· the said territory proposed to be incorporated, and all of your petitioners moreover reside therein.

"Whereof, your petitioners pray for an order incorporating the said territory within the said county of St. Louis, Missouri, as a city of the third class, under the name of Wellston and for such orders in the premises as may be in conformity with law.

"And your petitioners will ever pray," etc.

The finding of fact by our special commissioner (so far as material to questions raised) follows:

"I find from the pleadings and the evidence the material facts upon which the case must turn to be substantially as follows:

"That on the third day of May, 1909, the respondents, also John Sacks, and other persons, filed in the county court of St. Louis county a petition (said petition consisting of several separate petitions) wherein they prayed that the inhabitants of the hereinafter described territory within the county of St. Louis and State of Missouri, be incorporated as a city of the third class, under the name and style of 'Wellston'; said territory being described in said petition as follows, to-wit: (here follows description); that said petitions do not set out the metes and bounds of the 'commons' within or appertaining to said above described territory; . . . or pray that a police be established for the preservation and regulation of any 'commons' appertaining to said proposed city; . . . that the county court at the time it made and entered said order had no evidence or information before it from which the number of persons residing in said territory subject to taxation could be ascertained, and said county court knowing that it did not have such evidence or information, knowingly and willingly refused to make an investigation, or to require evidence from which the number of such persons could be ascertained, and said court in fact did, at no time, ascertain by evidence or investigation, nor did it make a finding as to the exact number of persons within said territory subject to taxation; . . .

"That certain unknown persons conspired to fraudulently procure the order of incorporation from the court, and to practice a fraud upon said court, and the inhabitants of said above territory described in said order of incorporation, and to that end such unknown persons signed, or caused to be signed and placed upon

said petitions, the names and signatures of a number of persons without the knowledge, authority or consent of such said persons whose names and signatures so appeared as petitioner on said petition, which said names and signatures purported to be the signatures of taxable inhabitants residing in said territory, and without said persons whose names purport to be signed to said petition having in fact signed the same; that notwithstanding a number of signatures to said petition were shown to have been signed, attached to and placed upon said petition by said unknown persons without the knowledge, authority or consent of said persons whose names purport to be signed to said petition having in fact signed the same, and that notwithstanding the fact that a number of the signers to said petition had removed from said territory between the time of the signing of said petition and its filing on May 3, 1909, the said county court, knowingly and willfully, refused to require evidence of the genuineness of the signatures to said petition, and knowingly and willfully failed and refused to require proof that at the time said petition was filed the signers to said petition were inhabitants of the territory described in the order of incorporation."

The question is: Shall judgment and writ of ouster go as our commissioner recommends? I think they should. This, because:

(a) The statute authorizing the incorporation of cities or towns by the county court describes the character and scope of the petition to be presented and uses the word "commons" and the phrase, "commons appertaining to such city or town." The petition in the instant case pretermitted all reference to commons. In his conclusions of law our commissioner held that omission fatal, jurisdiction failing. The incorporating judgment follows the petition in such omission. Respondents take exception to that conclusion, and such exception presents the first matter for determination.

Whether the omission is fatal depends no little on the meaning of the statutory word "commons." For respondents it is argued that the statute is very old, originating four years after this Government took over the territory ceded by France in the Louisiana Purchase. [1 Mo. Terr. Laws, pp. 184-185.] Therefore, they say, as the word has been carried forward in the statute from that day to this, the mind of the juristic scholar must go back to the quaint and singular conditions and usages of French and Spanish villages in Upper Louisiana to gather the meaning of "commons." Informed by the annals of those times, it is argued the word commons in the incorporating act means commons as existing and understood at that time in those villages; that the lawmaker was dealing with commons of that sort. Certainly, the day was when the villages of Portage Des Sioux, St. Charles, St. Louis, St. Ferdinand, Village a Robert (now Bridgton), Ste. Genevieve, New Bourbon (afterwards a part of Ste. Genevieve) and Cardonelet were governed by syndics and had common field lots, out lots, village lots and commons—each with a well defined and peculiar meaning in a French or Spanish village, whose inhabitants brought from their mother country customs and laws singular to community village interests, not native to English speaking people. In the case of common field lots they were aggregations of narrow parallelograms, loosely speaking, of land under one fence, each lot of so many arpents (an arpent being a little more or less than an acre, varying with locality and with whether it was an arpent *d'ordonnance,* an arpent *commun,* or an arpent *de Paris*), and doubtless were cultivated by villagers each working his own lot at the same time his neighbor did his, not only for sociability, but for mutual protection from "clawed" beasts of the forest and prowling Indians. As counsel say, Mr. Justice CATRON in Chouteau v. Eckhart, 43 U. S. 1. c. 373, learnedly discusses the his-

torical, social and legal significance of the customs and policies of those villages in the particulars in hand, and the inquiring scholar may study that case with profit. The diligence of counsel also points us to Fine v. St. Louis Pub. Schools, 39 Mo. 59, and Harrison v. Page, 16 Mo. 182, as throwing a side light on the matter. One division of this court, in a case now *sub judice*, heard with pleasure and profit an illuminating discourse on the several meanings of French and Spanish "out lots," "village lots," "common field lots," and "commons" from Edward C. Kehr, Esq., of the St. Louis bar a short time before the instant case was argued in Banc. On the argument of the instant case I leaned to the view of respondents' learned counsel, to the effect that the meaning of "commons" took a controlling color and twist from commons as known to the early French Village, and, since such commons had passed away, the word in our present statute became in a sense a dead letter as referring to a dead thing; therefore, the incorporating petition by pretermitting all reference to commons, whether existing or non-existing at Wellston, could not be held to be fatally defective as violating the statute. But research and reflection altered my views.

We need hardly go back a hundred and more years to the days when Kaskaskia of Illinois was in her pristine and now forgotten glory—when she as queen of trade and ahead of all towns in wealth and population ruled the roost (to borrow a chimney-corner figure) in the West. Much of curious interest to the student of history lies back there. In those days, 'tis said, the wags of that same vain and "cocky" Kaskaskia flippantly dubbed our own St. Louis, *"Pain Court;"* our Carondelet, *"Vide Poche;"* our Ste. Genevieve, *"Misere;"* our Kahokia, *"Pouilleux"*—in which outlandish nicknames, gravely preserved in sober annals, lie comedy and tragedy, smiles and sighs, if one but crack the French shells of them and get the

kernel of each thereof (those selfsame kernels smack-ing of *short of bread, empty pockets, wretchedness and lice,* severally)—we say we need not go so far back to get at what the lawmakers meant by "commons."

It is error to say the statute in review is ancient and dealt with an ancient and gone-by situation. *Con-tra,* it was made by modern lawmakers, using modern words in a modern sense. It is very much alive and deals with existing things, and looks (as all statutes should) to the future. The territorial law of 1808, re-ferred to by counsel, was repealed in 1825 (2 Laws of Mo. 1825, p. 500, sec. 13) and a new law took its place (2 Laws of Mo. 1825, p. 764). The word commons, then used, presumably was used (not in an old and worn out, but) in an allowable and understood sense. That law was subsequently amended and revised in material aspects. Appearing as section 4385, Revised Statutes 1879, it was repealed out and out in 1887 (Laws 1887, p. 33, *et seq.*), and a new statute enacted. The word commons then used must be given an up to date "1887" meaning. In 1875 the statute then exist-ing employed the word commons, and in State ex rel. v. McReynolds, 61 Mo. l. c. 210, we construed that word to mean "lands included in or belonging to a town set apart for public use." Continuing, we said, "And in fact the natural import of the word when used in connection with or with reference to towns and vil-lages, is public grounds belonging to or appurtenant to the town or village."

Commons is defined by Webster: "Land held in common, as by all members of a community; a tract of ground for pleasure, for pasturage, etc., the use of which belongs to the public or a number of persons." [Web. New Int. Dic., Tit. Common.] Black, among other things, says of this word: "The word common also denotes an uninclosed tract of land set apart for public and municipal purposes in many cities and vil-lages in the United States. [Black L. Dic., Tit. Com-

mon.]   In Goode v. St. Louis, 113 Mo. 257, there is
an exhaustive discussion of the meaning of the word
in grants, dedications and laws pertaining to towns
and villages.   It is there shown not to be a synonym
of park or pleasure ground but to have a much more
comprehensive meaning—that is, it may include park
or pleasure ground or other ground set apart for mu-
nicipal or public purposes in cities and villages, de-
pending somewhat on the connection in which it is
used.   In Cummings v. St. Louis, 90 Mo. 259, an addi-
tion to that town was platted, having thereon land
marked "A."    "A," it is then said, "is to be and re-
main a common forever."   It became known as "Ex-
change Square."   It was held that the proprietors
dedicated the tract to public use; that they used "the
word common, not in any technical sense, but in its
popular signification, as a parcel of ground set apart
for common and public use, for the convenience and
accommodation of the inhabitants of the city."

Recurring to the statute, it ordains that a majority
of the inhabitants shall present a petition to the
county court. What kind of a petition? *Any* petition?
Not at all.   A petition making those allegations the
pleader thinks relevant and sufficient?   No.   The law-
maker directs what he wants set forth, viz., "setting
forth the metes and bounds of their city or town *and
commons* and praying that they may be incorporated
. . . and for the *preservation and regulation of any
commons appertaining to such city or town.*"   When
that kind of a petition is presented, and not till then,
the court has power to act in creating a new govern-
mental agency, incorporating a town.   It, first being
"satisfied that a majority of the taxable inhabitants
have signed the petition," goes on to give judgment.
It "shall declare such city or town incorporated," etc.

The petitioners go into a court of limited and in-
ferior jurisdiction and invoke a high statutory power
granted to that court to be used only on the strict con-

dition precedent that a petition be presented of the character prescribed by the same statute. In such case, the rules are: (1) That where a statute creates a right and provides a remedy, as here, the remedy so provided is preclusive and must be followed. [State ex rel. v. Trust Co., 209 Mo. l. c. 493; Clark v. Railroad, 219 Mo. l. c. 538-9.] (2) That on direct attack, as here, presumptions are not indulged to support or eke out the jurisdiction of courts of inferior and limited jurisdiction (those not proceeding according to the course of the common law), but their jurisdiction must affirmatively appear on the face of their proceedings. [State ex rel. v. Wilson, 216 Mo. l. c. 277.]

We have no call to read anything of substance out of that statute that the lawmaker has taken the pains to put into it, or read anything into it that he has taken pains to leave out of it. In clear words he has said what the petition shall set forth and for what it shall pray. The commands of the statute are simple and few. They lay out a straight and narrow road to follow. Prosperous and happy is he who walks therein; for obedience to those commands is a jurisdictional requirement. We are not saying that a petition need set forth the metes and bounds (or pray for the preservation and regulation) of commons if there are no commons. That would be absurd and courts are not allowed to unnecessarily put absurd constructions on statutes. We are saying the statute means that where there are commons—any such parks, public pleasure grounds or other public grounds, as come fairly within the designation of commons—they should be set forth by metes and bounds in the petition and the prayer should refer to them in apt and statutory way, and that where there are no commons that fact should be alleged as an excuse for the absence of a description by metes and bounds, and such prayer. It is not an unreasonable or fanciful hypothesis that the original proprietors of the land, as densely populated

as Wellston, may have dedicated parks, squares, public grounds or other sort of commons as an inducement to further the sale of lots and parcels of ground for residence purposes and crown a speculative venture with success. Such proprietors may have had in mind the health and pleasure of people invited to become members of an urban community. Boston Common, a notable pleasure ground and beauty spot, was dedicated by its then owners and set apart by the town in 1634 "for the common use of the inhabitants of Boston as a training-field and cow pasture." [Codman v. Crocker, 203 Mass. 146.] Nor is it an unreasonable or fanciful hypothesis, that the municipal preservation and control of such commons shall be an object of solicitude to the lawmaker, and should be provided for in the petition and judgment for incorporation.

The existence or non-existence of commons in an unincorporated town is not a matter of which courts will take judicial notice. It is matter of allegation and proof and the statute clearly contemplates that the record should show the facts.

In so ruling we are not, by a dry and lifeless technicality, overturning the incorporation of a town where there are vested interests acquired on the strength of a supposed valid corporate existence, one long acquiesced in by the State and where the doctrine of waiver has play. Here the town was born in throes and pains and its stormy and short life is challenged from the start.

Nor are we sticking on mere words and overlooking substance. Commons are of substance in urban life. Commons, pleasure grounds, breathing and beauty spots, parks, play grounds, "the village green," public "squares," places dedicated to the common use of the whole community are not mere sentimental conceits. Neither the unlearned nor the learned, the dreamer nor the utilitarian, the courts nor the fireside, the child nor adult so regard them. With one accord

all agree that commons in some form are useful elements in wholesome municipal life, well worthy of the attention of laws and courts. Surely the matter has pith enough to be dealt with in incorporating a town.

Nor are we giving a sour, narrow, far-fetched or too strict construction to the statute. Attend to the great Solomon who says (Proverbs, XXX, 33): Surely . . . the wringing of the nose bringeth forth blood. Seizing that proverb as applicable to jurisprudence, Lord Bacon by way of comment saith: "And where the wine-press is hard wrought, it yields a harsh wine, that tastes of the grape-stone. Judges must beware of hard constructions and strained inferences; for there is no worse torture than the torture of the laws." [*Vide,* Of Judicature.] So, too, run the maxims: *Summum jus, summa injuria,* which may be freely rendered into, a too strict or rigid interpretation of the law is frequently productive of the greatest injustice; *apices juris non sunt jura,* which is said to mean in effect that right, too rigid, hardens into wrong. We have not wrenched the statute, or corroded the bowels of its text. It means what it says. It stands on good reason, and we but enforce both its words and reason, when we hold the county court was without jurisdiction because the incorporating petition was fatally defective. The need of police regulation in Wellston may be pressing and considerable as argued at our bar. But it is better for its corporate health that the town be born regularly with no infirmity or bar-sinister on its escutcheon. The courts are open, the remedy, the facts and speedy relief are ready at hand, and the latter easy of accomplishment.

The conclusion of our commissioner on that point is approved.

(b). Of fraud in the concoction of the judgment.

Our commissioner found such fraud as vitiated the judgment.

(1)   It is argued for respondents that fraud is not a proper subject of inquiry in an action at law such as *quo warranto*—that the suit should have been by way of a bill in equity in the name of the State. But we are not impressed with that view of it.   The rule in this jurisdiction is that the life of a corporation must be challenged, if at all, by *quo warranto*.   That is, by a direct attack by the State, instead of by an indirect or collateral attack by an individual.   We had occasion to review at some length the case-learning on that question in a late case, Black v. Early, 208 Mo. l. c. 303, *et seq.*, and that discussion is reason for putting another aside.   Counsel cite us to cases in other jurisdictions where equity has entertained jurisdiction, but they frankly admit that in the most of those "cases the suits brought by the law officer of the crown or State were in cases of public charities, or to control the action of *quasi* public corporations." In this jurisdiction the rule of practice is that the question of fraud in the incorporation of a town is inquired into on *quo warranto* where the issue of fraud is raised.   [State ex rel. v. Fleming, 147 Mo. 1; State ex inf. v. Fleming, 158 Mo. 558.]   Such inquiry was recognized as proper in State ex rel. v. Job, 205 Mo. 1.   The same doctrine is laid down as a general one by the books.   [32 Cyc. 1424.]   It is elementary that fraud is cognizable in law as in equity.   It is a head of jurisdiction in both. Absent a reasoned precedent of our own to the contrary, we rule that fraud is a subject of inquiry in *quo warranto* to test the validity of a judgment incorporating a town in Missouri.

(2).   It is argued that our commissioner improperly permitted the judges of the county court to testify to facts impeaching the judgment of that court. For relator it is argued they were competent witnesses in that behalf and we are cited to cases sustaining that view of it.   But we do not think the question is here at this time.   That particular objection seems

not to have been made at the time the testimony went in. That was the appointed time. It is in law (in the matter of introducing testimony) as in the traditional marriage ritual and ceremony, viz., the objection relied on should be made at the time or thereafter parties "should hold their peace." [Bragg v. Railroad, 192 Mo. l. c. 345, *et seq.*]

(3) The statute ordains that as a condition precedent to incorporation, the county court "shall be satisfied that a majority of the taxable inhabitants of such town have signed such petition." That court found the fact to exist and adjudged its satisfaction. It is averred in the petition for the writ, that such judgment was fraudulently concocted and our commissioner so found. There is no testimony showing actual fraud in the sense of corruption, criminality or any form of moral turpitude. The county court practically took the remonstrance and petition for it, and did not go on to ascertain the number of taxable inhabitants by legal proof. The burden was on the incorporating petitioners to make out a prima facie case in the first instance, and if that case was successfully rebutted, it was the duty of the court to require such further proof as satisfied the court by a fair preponderance of the evidence. The method adopted, as disclosed by our commissioner's report and the testimony, was easy but bad. It amounted to a legal fraud—a fraud on the law and orderly procedure. That is what our commissioner means in his report and the testimony sustains his finding.

However, the character of proof necessary to set aside a judgment for fraud presents a vexed and delicate question. It is a field of judicial exploration full of perplexity and nice distinctions abound. The cases are not all in accord (Howard v. Scott, 225 Mo. l. c. 711, *et seq.*), and as this case breaks on a failure of jurisdiction to render the judgment a statement and discussion of the facts and the law applicable

to the facts are not necessary under the head of fraud; and for that reason we do not state or discuss them, but our examination of the facts leads us to the conclusion that there was a legal fraud.

(c). A question was propounded from the bench during oral argument directed to the absence of the town of Wellston as a party defendant. That question has received the attention of counsel in supplemental briefs. It has been held that the officers of a town where its incorporation is challenged are the proper parties in *quo warranto*. The town is a proper party under certain circumstances discussed by the books, but this case is not of that class. [See authorities infra, State ex rel. v. Coffee, 59 Mo. 59; (*Vide* p. 67 *et seq.*); State ex rel. v. McReynolds, 61 Mo. 203 (p. 212); State ex inf. Fleming, 147 Mo. 1 (pp. 8, 9); s. c., 158 Mo. 551 (pp. 567-8); State ex inf. v. McLain, 187 Mo. 409 (p. 414); State ex rel. v. Gravel Road, 116 Mo. App. 175 (pp. 193 *et seq.*); State ex rel. v. Small, 131 Mo. App. 470 (pp. 478 *et seq.*).] To unsettle rules of practice breeds uncertainty. The maxim is: Obedience is miserable where there is no certainty in the law. If any good reason exists for exploding the doctrine announced, it has neither been given nor does it occur to us. *Stare decisis*.

We conclude a writ of ouster should go because the judgment is void for legal fraud and for lack of jurisdiction. Accordingly one is ordered to issue.

All concur, except *Valliant, C. J.,* who is absent, and *Woodson, J.,* who concurs in all said except in the disposition made of the absence of Wellston as a party; he does not concur in that and therefore does not concur in the result.