OF THE

## STATE OF MISSOURI

AT THE

### APRIL TERM, 1911.

*(Continued from Volume 234)*

## CITY OF ST. LOUIS, Appellant, v. ST. LOUIS BLAST FURNACE COMPANY.

**Division One, June 1, 1911.**

1. **TOWN LOTS: Village Lots: Common Field Lots: Commons: Signification Under French Regime.** The term "town lot" or "village lot" had the same signification with the French inhabitants of the villages or towns along the Mississippi at the time of the Louisiana Purchase that it has with us. But the terms "common fields" and "commons" were of French origin, and were used in the several acts of Congress relating to lands pertaining to these villages in the sense in which they were used by the French inhabitants of these villages at the date of the transfer of Louisiana Province to the United States. At that time the French inhabitants lived in the village, and their houses were on separate village lots, and the fields they cultivated were outside, adjoining the village, but though generally under a ' common fence were held and cultivated in severalty; and these village lots and common fields were the subject of individual ownership. But in addition to them the inhabitants of the village also had what they called "com-

St. Louis v. Blast Furnace Co.

mons," which was a large body of land not divided or held in severalty, nor subject to individual ownership, but held in common by the whole body of inhabitants and used for pasturage or wood.

2. ———: ———: ———: ———: Title Conveyed by Act of Congress. The Act of Congress of June 13, 1812, conferred on the individual whatever title the United States had on December 20, 1803, to the village lot of which before that date he had been or was then in possession, and the title to the common field lot which he had been and was then cultivating, and it reserved to the United States for school purposes all village lots, out lots and common field lots not rightfully owned or claimed by private individuals or held as commons belonging to the village. But it expressly provided that it should not affect the rights of any person whose claims of any lands had previously been confirmed by the commissioners.

3. LOT IN FRENCH VILLAGE: Conway Certificate. The Conway Certificate. signed "F. R. Conway, Recorder of Land Titles in the State of Missouri," relating only to the confirmation of the claim of the inhabitants of Carondelet to a common of 6,000 arpens of land which lay outside of the village, is irrelevant in a suit to establish title to an accretion to a lot in the village not embraced within the common. The Act of 1806 did not confer upon a recorder of land titles the duty to make such a certificate; the Act of 1824 authorized him to issue a certificate of confirmation for each claim confirmed under the Act of 1812 to owners of village lots, out lots and common field lots, but it did not refer to the claim of a community to a common; and the real purpose of that act was to enable the Surveyor-General to distinguish the private lots already confirmed to their owners from the vacant lots appertaining to the village, and to enable him to distinguish the lots reserved for school purposes and the extent and boundary of the common reserved to the inhabitants of the village. It was not designed to confer title and it conferred none. That certificate is not available to the city of St. Louis (which succeeded to the title to the vacant lots and commons reserved for school purposes at Carondelet) to establish the fact that a lot within the village belonged to the village.

4. ———: Brown's Survey. The surveys called for by the Acts of 1812 and 1824 are not made evidence of title and were not designed for that purpose. It is evidence of the extent and boundaries of the common and lands to which the act confers title, but the title was not derived from the survey; if the inhabitants of the village acquired title to village lots, common field lots or commons they did so under prior acts of Congress, and not under the survey. When the survey of the com-

mons was accepted by the village it was conclusive on the village, or any one claiming through or under it, as to the extent and boundaries shown by the survey, but it is not evidence against one not so claiming and who has not assented to it.

5. ———: Title to St. Louis: Under Acts of Congress: Burden. The burden is on the city of St. Louis, suing for the lot in Carondelet, to show that the lot was a vacant, uninhabited and uncultivated lot on Dec. 20, 1803, as well as is the burden of showing that the lot was one of those reserved for school purposes. In whatever capacity the city asserts title, the burden is on it to show that, by the acts of Congress and the act of the General Assembly of 1833, the lot became the property of Carondelet.

6. ———: ———: ———: What Acts Show. The various acts of Congress and of the General Assembly do not demonstrate that a certain lot in Carondelet was a vacant, uninhabited and uncultivated lot on December 20, 1803, or that it was reserved by those acts and subsequently granted to Carondelet in its own right and for its own use. And even if it was a vacant, uninhabited and uncultivated lot on that date, and by those acts reserved for school purposes, the city of St. Louis cannot recover it unless it first establishes that as trustee for the schools of Carondelet it succeeded to whatever right the city council of that town had under its charter to obtain possession of the lot for school purposes.

7. ———: Towpath. A towpath was an appurtenance to the navigation of the river. The right to it in no sense belonged to the inhabitants of a French village, but to all persons engaged in towing boats on the river. It was never a fixed locality, like a street in a town or village, but shifted as the banks of the river changed or as its waters rose and fell. The right to use it was a mere easement, and ceased when the use ended, and the title remained while it was so used in the riparian owner. Even though the commissioners, in confirmation of the lots of Carondelet to individuals, described the lots as "bounded east by the Mississippi River, leaving space for a tow," that did not give Carondelet or its inhabitants title to the towpath, or reserve it for them.

8. ———: Ejectment: Defendant's Weak Title. Plaintiff in ejectment must recover on the strength of his own title. He cannot recover alone on the theory that the deed under which defendant claims did not include the lot in suit.

9. ———: ———: Ejectment: Tenant: Claim Under Contract. Where neither the possession of defendant nor the title claimed by it was derived under a contract between a smelting com-

pany and the town of Carondelet, to whose rights plaintiff had succeeded, defendant is not a tenant of the plaintiff and is not estopped to deny plaintiff's title.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel G. Taylor,* Judge.

Affirmed.

*Lambert E. Walther* and *Henry W. Allen* for appellant.

(1) An action for the recovery of possession of land may be maintained against any person not having a better title thereto, in all cases where the plaintiff claims possession thereof under or by virtue of a confirmation made under the laws of the United States. R. S. 1909, sec. 2383; Janis v. Gurno, 4 Mo. 458. (2) The Act of June 13, 1812 (2 U. S. Stat. at L. 748), and the supplementary acts of May 26, 1824 (4 U. S. Stat. at L. 65), and of January 27, 1831 (U. S. Stat. at L. 435), operated *ex proprio vigore* to divest the title of the land designated therein out of the United States and to vest it in the inhabitants of the village. See Carondelet v. St. Louis, 25 Mo. 459; also Vasseur v. Benton, 1 Mo. 296; Janis v. Gurno, 4 Mo. 458; Lawless v. Newman, 5 Mo. 236; Gurno v. Janis, 6 Mo. 330; Ashby v. Cramer, 7 Mo. 98; Hammond v. Schools, 8 Mo. 65; Dent v. Bingham, 8 Mo. 579; Trotter v. Schools, 9 Mo. 69; Montgomery v. Landusky, 9 Mo. 714; Page v. Scheibel, 11 Mo. 167; Harrison v. Page, 16 Mo. 182; Gamache v. Piquignot, 17 Mo. 310; Soulard v. Clark, 19 Mo. 582; Carondelet v. McPherson, 20 Mo. 201; Milburn v. Hortiz, 23 Mo. 532; Vasquez v. Ewing, 24 Mo. 31; Funkhouser v. Langkoff, 26 Mo. 453; Primm v. Haren, 27 Mo. 205; Milburn v. Hardy, 28 Mo. 514; Dent v. Sigerson, 29 Mo. 489; Carondelet v. St. Louis, 29 Mo. 527; Fine v. St. Louis Public Schools, 30 Mo. 166; Barry v. Blumenthal, 32 Mo. 29; Langlois v. Crawford, 59 Mo. 456; Glasgow v. Baker, 85 Mo. 559, and

128 U. S. 560; St. Louis v. Railway, 114 Mo. 13; Strother v. Lucas, 12 Peters, 412; LeBois v. Brammell, 4 How. 457; Guitard v. Stoddard, 16 How. 494; Savignac v. Garrison, 59 U. S. 136; Glasgow v. Hortiz, 66 U. S. 595; Carondelet v. St. Louis, 66 U. S. 179; Dent v. Emmeger, 81 U. S. 308; Ryan v. Carter, 93 U. S. 78. (3) Brown's Survey of the Commons of Carondelet was authorized and approved. Dent v. Sigerson, 29 Mo. 489. (4) The approved survey of the boundaries of a village, confirmed by the Act of June 13, 1812, is equivalent to a patent. Vasquez v. Ewing, 24 Mo. 31; Le Bois v. Brammell, 4 How. 449; Robbins v. Eckler, 36 Mo. 494; Kissell v. Schools, 16 Mo. 553. (5) The city of St. Louis has succeeded to Carondelet's title. Laws 1870, p. 458; Scheme and Charter of St. Louis. (6) The affidavits and evidence submitted before the land commissioners and the recorder and preserved in their minutes are not competent evidence to show possession prior to December 20, 1803. Janis v. Gurno, 4 Mo. 458; Ashley v. Cramer, 7 Mo. 98; Soulard.v. Clark, 19 Mo. 570; Carondelet v. McPherson, 20 Mo. 192; St. Louis v. Toney, 21 Mo. 243; Vasquez v. Ewing, 24 Mo. 31. (7) The Act of March 3, 1807, did not *proprio vigore* vest the title in the claimants; the favorable action of the commissioners, followed by the execution of a patent, was necessary to complete the title. Burgess v. Gray, 16 How. 48. (8) The confirmation by the "Old Board" does not describe any land with sufficient definiteness to locate it. It also calls for a survey to be made in accordance with the actual possession. No such survey was ever made. (9) The confirmation of a Spanish grant without showing location is not sufficient. Waddingham v. Gamble, 4 Mo. 465; Vasquez v. Ewing, 42 Mo. 247; Baird v. St. Louis Hospital Assn., 116 Mo. 419; Snyder v. Sickles, 98 U. S. 203; Landes v. Brant, 10 How. 348; West v. Cochran, 17 How. 403; Ledone v. Black, 18 How. 473. (10) Where the documentary evidences of title pro-

duced by the claimant contains no sufficient lines or boundaries to show that any definite and distinct parcel of land was severed from the public domain, the universal rule is that the concession in such case creates no right of private property in any particular tract of land which can be maintained in a court of justice without an antecedent survey and location.  U. S. v. King, 3 How. 786; U. S. v. Forbes, 15 Pet. 173; The Houmas Claim, 4 Op. Atty. Gen. 693; Magwire v. Tyler, 75 U. S. 650.  (11)  Where the claim has no certain limits and the degree of confirmation carries with it the condition that the land must be surveyed, then it is beyond controversy that the title of the claimant, although confirmed, attaches to no land, nor has a court of justice any authority in law to ascertain and establish the boundaries, as that power is reserved either to the Executive Department or to Congress.  Stanford v. Taylor, 18 How. 412; Bissell v. Penrose, 8 How. 334; Magwire v. Tyler, 8 Wall 650; Carondelet v. St. Louis, 1 Black 179; D'Auterieve v. U. S., 101 U. S. 700.

*Edward C. Kehr* for respondent.

(1)  Acts of Congress for ascertaining and adjusting titles to land in the District of Louisiana.  Mar. 2, 1805, 2 U. S. Stat. at L. 324; Apr. 21, 1806, 2 U. S. Stat. at L. 391; Mar. 3, 1807, 2 U. S. Stat. at L. 440; Apr. 29, 1816, 3 U. S. Stat. at L. 328.  (2) An act making further provision for settling the claims to land in the territory of Missouri, approved June 13, 1812, 2 U. S. Stat. at L. 748.  The first section of the act was a present operative grant, vesting in the individual, from the date of its passage, the complete legal title to the land he or those under whom he claimed had inhabited, cultivated or possessed prior to Dec. 20, 1803.  Vasseur v. Benton, 1 Mo. 216; Gurno v. Janis, 6 Mo. 330; Janis v. Gurno, 4 Mo. 458; Biehler v. Coonce, 9 Mo. 343; Montgomery v. Landusky, 9 Mo. 705; Page v. Scheibel, 11

Mo. 167; Harrison v. Page, 16 Mo. 182; Soulard v. Clark, 19 Mo. 570; City of St. Louis v. Toney, 21 Mo. 243; Milburn v. Hortiz, 23 Mo. 532; Carondelet v. St. Louis, 25 Mo. 448; Funkhouser v. Langkopf, 26 Mo. 458; Milburn v. Hardy, 28 Mo. 514; Fine v. Schools, 30 Mo. 166; Williams v. Carpenter, 42 Mo. 327; Glasgow v. Lindell's Heirs, 50 Mo. 60; Glasgow v. Baker, 85 Mo. 559; Glasgow v. Baker, 128 U. S. 560; Langlois v. Crawford, 59 Mo. 456; Peting v. DeLore, 71 Mo. 13; Guitard v. Stoddard, 57 U. S. 494; Savignac v. Garrison, 59 U. S. 136; Glasgow v. Hortiz, 66 U. S. 595; Ryan v. Carter, 93 U. S. 78. By the second section of the act all lots not rightfully owned or claimed by private individuals or held as common or reserved for military purposes, are reserved for the support of schools and were relinquished by the government to the schools by the act of January 27th, 1831. Trotter v. Schools, 9 Mo. 68; Kissell v. Schools, 16 Mo. 553; Kissell v. Schools, 59 U. S. 19; Strother v. Lucas, 37 U. S. 455. (3) Act of May 26, 1824, 4 U. S. Stat. at L. 65; act of Jan. 27, 1831, 4 U. S. Stat. at L. 435. (4) The defendant in ejectment is entitled to the possession against all the world but the right owner. The plaintiff in ejectment must recover, if at all, on the strength of his own title. Marvin v. Elliott, 99 Mo. 616; Mather v. Walsh, 107 Mo. 121; West v. Brettelle, 115 Mo. 653; Kingman v. Sievers, 143 Mo. 519. In ejectment, plaintiff must stand on his own title and if he has none he cannot recover against the party holding the possession. Large v. Fisher, 49 Mo. 307. (5) Conway's Certificate purports to confirm the commons only and has no reference to village lots. Moreover it was made without authority and is not evidence of title. Primm v. Haren, 27 Mo. 210; Gamache v. Piquignot, 17 Mo. 310, 57 U. S. 451. (6) Brown's Survey is not evidence of title. A survey determines the location and boundary of land, but never its title. The inhabitants of the village took title to their lots under the acts of Con-

gress of March 3, 1807, and June 13, 1812, but Caronde-
let as a community had no title to the body of land
claimed as their common, until its boundary and loca-
tion was determined by Brown's Survey, and that sur-
vey was approved by the Government and accepted by
Carondelet. When so approved and accepted, it deter-
mined, as between the Government and Carondelet, the
body of land to which the latter took title as its com-
mon. Carondelet v. St. Louis, 66 U. S. 179; Milburn v.
Hortiz, 23 Mo. 537; Eberle v. Schools, 11 Mo. 258;
Barry v. Blumenthal, 32 Mo. 29; Glasgow v. Lindell,
50 Mo. 80; Glasgow v. Hortiz, 66 U. S. 595; Dent v.
Bingham, 8 Mo. 579; Carondelet v. McPherson, 20 Mo.
192; Carondelet v. St. Louis, 25 Mo. 448; Carondelet v.
St. Louis, 29 Mo. 527; St. Louis v. U. S., 9 Ct. Claims
Rep. 455; St. Louis v. U. S., 92 U. S. 462. (7) The
claim that Brown's Survey is prima facie evidence of
title, must necessarily be limited to land within the
commons. The lots in the village of Carondelet and
the tract known as the commons are entirely separate
and distinct bodies of land, held by different owners
and by different titles. Brown's Survey, which fixed
the location and boundaries of the commons, cannot be
evidence of title in Carondelet to a village lot, and it
has never heretofore been so claimed. An analysis of
the cases relied on by appellant shows that the doc-
trine was never invoked, except as to land within the
boundaries of the commons. Vasquez v. Ewing, 24 Mo.
31; Les Bois v. Bramell, 45 U. S. 449. (8) Respondent
claims title, not under Carondelet, but under the orig-
inal lot owners in the village. The quitclaim deeds of
Carondelet are not links in respondent's chain of title,
and the latter is not bound by them; they neither con-
vey title nor do they show a compromise; yet the prop-
osition is well settled that a vendee is not estopped to
dispute his vendor's title, and may claim under as
many titles as he has. Macklot v. Du Breuil, 9 Mo. 477;
Joeckel v. Easton, 11 Mo. 118; Blair v. Smith, 16 Mo.

273; Cutter v. Waddingham, 33 Mo. 269; Mattison v. Ousmuss, 50 Mo. 551; Cummings v. Powell, 97 Mo. 524. (9) Respondent is not estopped by the contract between Carondelet and the Lewis Iron Company, because: 1. Respondent is not party to the contract. 2. The privilege granted by it had expired years before respondent acquired the property. 3. The contract was *ultra vires*. Belcher Co. v. Elevator Co., 82 Mo. 121; Belcher Co. v. Elevator Co., 101 Mo. 192; Glasgow v. St. Louis, 87 Mo. 678; Cummings v. St. Louis, 90 Mo. 259; Schopp v. St. Louis, 117 Mo. 131; Dillon on Munc. Corp. 97 and 656; also 383 and 716. A contract on the part of the city not to levy and collect a tax is *ultra vires* and void. Springfield v. Smith, 138 Mo. 645. 4. The contract was repudiated by both parties to it. 5. In ejectment, plaintiff cannot recover on an estoppal *in pais*. Clay v. Mayr, 144 Mo. 376; Allen v. Sales, 56 Mo. 28; Dugal v. Fryer, 3 Mo. 31. (10) Carondelet at no time had title to the space marked on Eiler's Plat as "A Tow or Water Str.": 1. It is conceded that the plat does not operate as a statutory dedication and hence Carondelet derives no title from that source. 2. The "towpath" had no fixed location. It was a shifting easement which advanced or receded with the river, and was abandoned at an early day. When abandoned, the title of the owner was freed of the easement. Railroad v. Frowein, 163 Mo. 1. 3. The space was never used or improved as a public street. Leaving a lane through one's premises for the accommodation of the owner and his neighbors is a mere license and evinces no intention of dedication. Stacey v. Miller, 14 Mo. 478; Coberly v. Butler, 63 Mo. App. 466; K. C. v. Wollerd, 60 Mo. App. 631; Field v. Mark, 125 Mo. 502.

VALLIANT, J.—This is an action in ejectment. The land in suit, as described in the petition, lies between the east line of what was block 12 of Eiler's survey of the village of Carondelet (now block 2976 of the

city of St. Louis) and the Mississippi river, bounded south by the north line of Soper street extended to the river, east by the river, north by the south line of Kansas street, and west by the west line of what is now Front street, the same being designated on Eiler's map as a "Towpath" or "Water Street." It is an accretion to the land covered by the towpath and an accretion to block 12, if the towpath is a part of that block. It is not questioned that the defendant now owns the east half of block 12, and it claims to own the land in dispute as an accretion to the original block 12.

Plaintiff contends that the original block 12 was bounded on the east by the towpath and that the land covered by the towpath belonged to the village of Carondelet. The town of Carondelet was incorporated August 6th, 1832; it was incorporated as the City of Carondelet by an act of the General Assembly approved March 1st, 1851, Laws 1850-1851, p. 139; it became a part of the city of St. Louis by an act of the General Assembly approved March 4th, 1870, Laws 1870, p. 458. By the act last named St. Louis acquired all the title that Carondelet had to the land in dispute.

On December 20th, 1803, at New Orleans, the French Government, acting by its representative, delivered to the United States, acting by their representative, the Territory of Upper and Lower Louisiana, in consummation of the treaty of April 30, 1803, between the United States and France. By article three of the treaty it was provided, *inter alia,* that the inhabitants of the ceded territory should "be maintained and protected in the free enjoyment of their liberty, property and the religion which they profess."

For the purpose of performing this part of the treaty obligation, Congress passed in succession several acts seeking to establish and confirm the titles of the then inhabitants to lands in that territory. The first of these was the act of March 2, 1805, 2 U. S. Stat. at L.

p. 324, in which provision is made for the proving of claims to land and the confirmation of titles so proven. The act authorizes a board of commissioners to be appointed by the President to hear proof and pass on the claims in a summary way, make a record of its proceedings and report the same to Congress. Experience showed that written or documentary evidence of title emanating from the French or Spanish government was sometimes difficult to produce, therefore Congress passed the act of April 21, 1806, 2 U.S. Stat. L. p. 391, and the act of March 3, 1807, *Id,* page 440, both designed to facilitate the proving of the claims. Those acts authorized the confirmation of the claim, so far as the United States could confirm it, on proof of occupation for ten consecutive years prior to December 20, 1803, and on that day. But again it was experienced that proof of continuous occupation for that period was difficult, and to meet that difficulty Congress passed the Act of June 13th, 1812, 2 U. S. Stat. L.p. 748, confirming titles to "town or village lots, out lots, common field lots, and commons, in, adjoining and belonging to the several towns or villages [naming them and including Carondelet] in the territory of Missouri, which lots have been inhabited, cultivated or possessed, prior to the twentieth day of December, one thousand eight hundred and three." The act excepts from its effect titles that had been theretofore confirmed by the board of commissioners.

An act approved May 26, 1824, Public Lands, vol. 1, p. 397, declares it to be the duty of the owners or claimants of lots whose titles were confirmed under the Act of June 13, 1812, to proceed within eighteen months to designate their lots by proof before the recorder of land titles for the state or territory of "the fact of such inhabitation, cultivation or possession and the boundaries and extent of each claim, so as to enable the surveyor-general to distinguish the private from the vacant lots appertaining to said towns and villages."

And on the expiration of the eighteen months the surveyor-general was required to cause a survey to be made and set. apart to the towns and villages for the support of public school the vacant lots, out lots and common fields .which had not before that time been designated by the President for military purposes. The surveyor-general was also required to survey and designate the commons belonging to the towns and villages according to their respective claims and confirmations; the recorder was required to issue a certificate of each claim confirmed, and was to furnish the surveyor-general a list of the lots so proven to have been inhabited, etc., "to serve as his guide in distinguishing them from the vacant lots to be set apart as above described," that is, for school purposes.

By the first section of an act approved January 27th, 1831, Public Lands, vol. 1, p. 478, the United States relinquished to the inhabitants of the towns and villages therein mentioned, including Carondelet, all title to the "town or village lots, out lots, common field lots, and commons, in, adjoining and belonging to said towns and villages, confirmed to them by the first section of the Act of June 13, 1812." By the second section of the Act of 1831, the United States relinquished their title to the lots reserved for school purposes. More especial reference to that section will be made herein later. Plaintiff also relies on an act of the General Assembly of date February 13, 1833, 2 Mo. Ter. Laws, p. 393. Appellant, the city of St. Louis, claims title to the land sued for by virtue of three of the acts of Congress above mentioned, to-wit, that of June 13, 1812, that of May 26, 1824, and that of January 27, 1831. The contention of the city is that when the act of June 13, 1812, went into effect block 12 of Eiler's survey was a vacant village lot and the title by that act did not pass to anyone, but was reserved by the United States and so held until the Act of January 27, 1831, by which,

as the plaintiff claims, it passed to the inhabitants of the village of Carondelet.

The defendant claims that the title to that block passed out of the United States to individuals under the previous acts above mentioned, and came by mesne conveyances from those individuals to defendant. It also claims title by adverse possession.

It will be noticed that the acts of Congress all speak of town or village lots, common field lots and commons.

The term "town or village lots" had the same signification with the French inhabitants that it has with us, but the terms "common fields" and the term "commons" were of French origin and were used in these acts of Congress in the sense in which they were used by the French inhabitants of Carondelet at the date of the transfer of the Louisiana territory from France to the United States. At that time the French inhabitants of Carondelet lived in the village and their houses were on the village lots, but the fields which they cultivated were outside, adjoining the village, held and cultivated in severalty, though generally under a common fence. The village lots and common fields were the subjects of individual ownership. In addition to village lots and common field lots, the inhabitants of the village also had what they called commons, which was a large body of land not divided or held in severalty, but held in common and used for pasturage and wood for fuel, etc.

The commons were considered as belonging to the whole body of inhabitants. [Chouteau v. Eckhart, 43 U. S. 344, l. c. 373; State ex inf. v. Woods, 233 Mo. 357.] It will be convenient to keep those definitions in mind when we are construing these acts of Congress. The Act of June 13, 1812, conferred on the individual whatever title the United States had at that date to the village lot of which before that date he had been and was then in possession, and to the common field lot

that he had been and was then cultivating, and it reserved to the United States for school purposes all village lots, out lots, and common field lots not rightfully owned or claimed by private individuals or held as commons belonging to the village. But the act expressly provided that it should "not be construed to effect the rights of any persons claiming the same lands, or any part thereof, whose claims have been confirmed by the board of commissioners for adjusting and settling claims to lands in the said territory." The title to the lots and commons reserved for school purposes by the Act of 1812 was by the second section of the Act of 1831 relinquished by the United States to be disposed of as specified in that section as we will hereinafter see.

To sustain its claim under the above mentioned acts of Congress and act of the General Assembly, the plaintiff introduced in evidence, 1st, what is called in the record "Conway's Certificate;" 2d, "Brown's Survey;" 3d, the act of the General Assembly above named; 4th, a contract between Carondelet and the Lewis Iron Company; and 5th, certain instruments which the plaintiff calls compromise deeds. The facts in relation to each of those items of evidence will be better understood if stated in connection with the discussion of it.

CONWAY'S CERTIFICATE. This is a certificate dated August 22, 1834, signed by "F. R. Conway, Recorder of Land Titles in the State of Missouri." It certifies that the inhabitants of the village of Carondelet . . . have been confirmed in their claims in common to six thousand arpens of land, being in townships 43 and 44 north, ranges 6 and 7 east of the 5th principal meridian, the same having been regularly surveyed, as appears by a plat and field notes thereof returned to this office by the Surveyor of the Lands of the United States in the States of Illinois and Mis-

souri, certified by him on the 29th day of July, 1834, etc. The survey there mentioned is what is called ''Brown's Survey'' in the record and was plaintiff's next offer.

The Conway Certificate was irrelevant to the issues in this case, even if it was an authentic document, which is disputed. It related only to a confirmation of the claim of the inhabitants of the village to a common of six thousand arpens of land which lay outside and southwest of the village, as Brown's Survey showed. The land in dispute is an accretion to a block in the village and is not embraced in the common. Besides, the Act of 1805 which called for the appointment of a recorder of land titles and defined his duties did not confer on him the duty to make such a certificate. The first section of the Act of May 26, 1824, purported to make it the duty of the individual owners or claimants of town or village lots, out lots, and common field lots ''whose titles had already been confirmed by the Act of 1812, to appear before the recorder of land titles and make proof of such inhabitation, etc., and then a survey was to be made under instructions from the General Land Office, showing the vacant lots reserved for school purposes as distinguished from those that had been confirmed to individuals. And by the third section the recorder was authorized to 'issue a certificate of confirmation for each claim confirmed;' that is, for each of the claims proven before him under the first section of the act, which were claims of the individual owners or claimants of town or village lots,'' etc.; it did not refer to the claim of a community to a common. So much of the Act of 1824 as essayed to make it incumbent on the individual owners of lots whose claims had been confirmed under the Act of 1812 to appear before the recorder of deeds and prove their claims was of no effect, because their titles had already been confirmed and the title had passed completely out of the United States. It has been so held by this court and the Su-

preme Court of the United States. [Carondelet v. St.
Louis, 25 Mo. 448, l. c. 460; Guitard v. Stoddard, 16
How. (57 U. S.) 494.] The real purpose of the Act
of 1824, as expressed in the concluding sentence of the
first section thereof, was: "to enable the Surveyor-
General to distinguish the private from the vacant lots
appertaining to the said towns and villages," so as to
enable him to designate the lots, etc., reserved by the
United States in the Act of 1812 for school purposes;
and to furnish information to the General Land Office
as to what lots were so reserved. It was not designed
to confer title and it conferred none. The survey was
necessary also to locate and establish the extent and
boundary of the common claim by the inhabitants of
the village, and until that was done the title conferred
on the community was to an undefined body of land;
the survey marked and defined the boundaries and the
title attached to the land so defined. But the title
came from the Act of Congress, not from the survey;
the survey was only evidence of the location and extent
of the land to which the title applied. We hold there-
fore that the Conway Certificate conferred no right
available to the plaintiff in this case.

2. BROWN'S SURVEY. Appellant contends that
Brown's Survey furnished prima facie evidence that
the title to all the land embraced in its boundaries
was vested in Carondelet, and that the prima facie case
could be overcome only by the defendant in possession
proving that the lot in question was actually inhabited
prior to December 20, 1803. There is no statute mak-
ing the survey evidence of title; the survey called for
in the Act of 1812 and the Act of 1824 are not given
that effect and were not designed for that purpose.
In the first section of the Act of 1812, the principal
deputy surveyor of the territory was required to sur-
vey and mark "the out boundary lines of the said
towns or villages so as to include the out lots, common
field lots, and commons thereto respectively belonging.

And he shall make out plats of the surveys, which he shall transmit to the Surveyor-General, who shall forward copies of said plats to the Commissioner of the General Land Office and to the Recorder of Land Titles.'' There is nothing there to indicate that the survey is designed to confer title or that the titles to be confirmed to individuals, or to the inhabitants as a community, by the board of commissioners, were conditioned on the making of that survey, or to be held in suspense until it was made and approved by the Surveyor-General. If the inhabitants of the village acquired title to village lots, common field lots or commons, they did so under the acts or acts of Congress, and not under the survey to be made as called for in the Act of 1812. If at the date of the Act of 1812 the boundary lines of the Carondelet commons were not established, a survey made thereafter, as called for in the act and approved by the Surveyor-General and accepted by Carondelet, would be evidence as between the United States and the village, of the area and boundary of the common, but in such case the title would be derived not from the survey but from the Act of Congress, and the same is true in reference to titles to village lots and common field lots. In Carondelet v. St. Louis, 25 Mo. 448, above referred to, the land in dispute lay north of Carondelet and between it and the city of St. Louis; each claimed it as its commons, under the Act of 1812. The city of St. Louis introduced in evidence a survey by Brown made in 1832, claimed to be under the same authority, that is, under the Act of 1812, as the Brown Survey of 1834, introduced in evidence by the plaintiff in the case at bar. The Brown Survey of 1832 was of the commons of St. Louis, that of 1834 was of the commons of Carondelet. This court held that the surveys when approved by the United States and accepted by the parties for whom they were made, were prima facie evi-

dence of the extent and boundaries of the respective towns, and when approved by the United States and accepted by the parties for whom they were made, were conclusive evidence on the United States and the towns respectively, and on all persons claiming under them or either of them subsequently to the grant. That is to say, it is evidence, not of title, but of extent and boundaries of the land to which the act confers title. The court also said that confirmations under the Act of 1812 were legislative grants without any conditions as to survey annexed. But the court said that the Brown Survey of 1832 of the commons of St. Louis, although conclusive on St. Louis, which had accepted it, was not conclusive on Carondelet or any one not claiming under St. Louis or under a grant from the United States subsequent to the Act of 1812. So it may be said of the Brown Survey of 1834 of the common of Carondelet, that when accepted by Carondelet it is conclusive evidence as to Carondelet and to one claiming under it, of the extent and boundaries shown by the survey, but is not evidence against one not so claiming and who has not assented to it. In no sense therefore can it be said that the survey conveyed title; the most that can be conceded to it under any circumstances, is that it is evidence of the extent and boundaries of the land to which title, if any, was conveyed to the inhabitants of the village by the act of Congress. And in the case at bar it would not be evidence even of those facts against the defendant, unless the defendant claimed under Carondelet or under a grant from the United States subsequent to the Act of 1812, which is not the fact.

II. What title did the inhabitants of the village of Carondelet acquire to the lot of land now in dispute under the Act of 1812? It acquired title to its commons, and Brown's Survey of 1834 may be assumed

for the present to correctly describe the extent and boundaries thereof. But the lot of land in suit was not in the area of the commons, it was a village lot, designated as block 12 in Eiler's map which plaintiff introduced in evidence. Plaintiff contends that at the date of the act of Congress, June 13, 1812, this was a vacant lot, and therefore one of the lots reserved in that act by the United States for school purposes, and that the United States relinquished to the town of Carondelet title to all of those lots by the second section of the Act of 1831. On the other hand defendant claims that this was not a vacant lot in 1812, but the title to it had been confirmed by the board of commissioners to persons under whom defendant claims, under the Act of 1812 and the preceding acts of 1805, 1806 and 1807.

Were the vacant lots ever granted to Carondelet? The acts of 1805, 1806, 1807 and 1812 were passed by Congress to carry out the obligation of the United States in their treaty with France of April 30, 1803, to maintain and protect the inhabitants of the ceded territory in the "enjoyment of their liberty, property and the religion they profess." The titles to the acts, their preambles and general tone all show that such was their prime purpose, therefore the grants in those acts first concerned village lots and common field lots inhabited or cultivated by individuals and commons used as such by the inhabitants as a community while under the French government. But having made that provision in the first section of the Act of 1812, in conformity to the treaty obligation, and provided for a survey of the out boundaries of the towns and villages so as to include the village lots, out lots and common field lots and commons, Congress proceeded in the second section to dispose of all other town or village lots, out lots or common field lots included in the survey, not rightfully claimed by individuals or held as commons by the inhabitants of the village or not re-

served by the President for military purposes, and this it did by providing that "the same are hereby reserved for the support of schools in the respective towns or villages aforesaid." Then came the Act of 1824, which required a survey to be made which would show the lots reserved for school purposes as distinguished from the lots confirmed to individuals and village inhabitants as a community. Then came the Act of 1831, the second section of which is as follows: "And be it further enacted, That the United States do hereby relinquish all their right, title and interest, in and to the town and village lots, out lots, and common field lots, in the State of Missouri, reserved for the support of schools, in the respective towns and villages aforesaid, by the second section of the above-recited act of Congress; and that the same shall be sold or disposed of, or regulated, for the said purposes, in such manner as may be directed by the Legislature of said State." The plaintiff claims that under that section of the Act of 1831 the title to the lots reserved for school purposes in the Act of 1812 was transferred to the town of Carondelet. We do no so interpret that act. It was a relinquishment of the title of the United States to those reserved vacant lots, but the title was not, in express terms, given to the town; the title of the United States was relinquished, to be disposed of in such manner as the State Legislature might by statute provide. The purpose to which the lots were devoted was expressed in the Act of 1812, and that purpose was never changed; to whomsoever therefore the title should be transferred would take it for that purpose. It has been held by this court and the Supreme Court of the United States that the Act of 1831 was a complete divestiture of the title of the United States, and when by a survey, as called for in the Act of 1824, the school lots were designated, the whole title was disposed of for the use of the public schools. Trotter v. St. Louis Public Schools, 9 Mo. 70; Kissell v. St. Louis

Public Schools, 16 Mo. 553, wherein at page 581 it is said: "It cannot be doubted that, under the acts of 1824 and 1831, and a designating and setting apart of property to the schools, by the Surveyor-General under the instruction of the Commissioner of the General Land Office, the whole title of the Government, legal and equitable, passes." The same case went to the Supreme Court of the United States. [Kissell v. St. Louis Public Schools, 59 U. S. (18 How.) 19.] That was an action in ejectment wherein the St. Louis School Board was plaintiff. In the opinion it is stated that the Legislature of Missouri in 1833 incorporated the Board of School Commissioners and in the act of incorporation gave the title to that incorporation of all lots and lands granted to the inhabitants of St. Louis for school purposes, and the land in dispute in that case being land so granted the title vested in the Board of School Commissioners.

The lots reserved by the United States under the Act of 1812, not selected by the President for military purposes, were reserved for the use of the public schools in the respective towns and villages, and whosoever took the title that passed under the Act of 1831 held it for that purpose and could not lawfully use it for any other purpose, nor could the General Assembly authorize it to be used for any other purpose; the language conferring the power on the General Assembly is: "And that the same shall be sold, or disposed of or regulated, for the said purpose, in such manner as may be directed by the Legislature of the State." Until the town of Carondelet was incorporated, in 1832, there was no legal body in whom the legal title could be vested, and that was probably the condition of other towns or villages to which the act applied, and that may have been the reason why it was not expressly provided in the act for the immediate vesting of the legal title. But in 1832 the town of Carondelet was incorporated, and in 1833 the General

Assembly passed the Act of February 13, 1833, under which plaintiff claims that the town of Carondelet acquired the right to sell and dispose of the property in question. We do not understand that act as applying to this property. At the date of that act the inhabitants of the town had a title either legal or equitable to the land embraced in the common.

Eiler's map, referred to in the act, and introduced in evidence by the plaintiff in this case, shows that there were lots in that common to which the act could apply and to which it apparently did apply. Neither in the title nor the preamble to the act is any reference made to lots acquired for school purposes or to the power conferred on the General Assembly under the Act of 1831; it does not purport to be an exercise of that power. The title of the act is, "An act authorizing the corporation of Carondelet to sell and convey certain lots of ground." The preamble is: "Whereas, it has been represented to this General Assembly that there are certain lots within the limits of the town of Carondelet, in the county of St. Louis, which belong to the inhabitants of that town in common; and whereas, it is also represented, that the sale of said lots would greatly conduce to the present and future welfare of said town; therefore be it enacted," etc. The first section of the act is: "The board of trustees of the town of Carondelet shall have authority to sell and convey in fee, all the vacant or unoccupied lots of ground to which the inhabitants of the town of Carondelet shall have the legal or equitable title, which are included in the survey of said town of Carondelet, made by Lawrence M. Eiler, deputy surveyor of the county of St. Louis, in November last, by authority of the said board of trustees."

Section 4 authorizes the board of trustees of the town to make compromises when the title of the town is disputed by adverse claimants. Section 5 is: "The funds arising from the sale and release of the lots

aforesaid shall be applied by the trustees of said town, at their discretion, agreeably to the provisions of the ordinance of the said town, for the common benefit of the inhabitants of the said town." It is apparent from the whole act that it was not intended by the General Assembly as an exercise of power conferred by the Act of Congress of 1831. There were lots other than the school lots for the act to affect, as Eiler's map shows; there were lots belonging to the inhabitants of the town in common; these school lots did not belong to the inhabitants of the town in common; the General Assembly did not intend to authorize the trustees of the town to apply the proceeds of the sale of lots dedicated for school purposes to "the common benefit of the inhabitants of the said town."

Under section 1 of article 6 of the Constitution of Missouri of 1820, which was the organic law of the State when the Act of 1833 above named was passed, it was ordained: "Schools and the means of education shall forever be encouraged in this State; and the General Assembly shall take measures to preserve from waste or damage such lands as have been or hereafter may be granted by the United States for the use of schools within each township in this State, and shall apply the funds which may arise from such lands in strict conformity to the object of the grant." In conformity with that requirement of the Constitution the General Assembly passed an act entitled, "An act to provide for the management and protection of school lands and for the establishment and government of common schools," approved January 17, 1825, wherein it was provided that "the sixteenth section, and every part thereof, and all town lots, out lots and common field lots lying in any school district . . . shall be appropriated to the use of the common schools in such district." By the first section of that act a board of school commissioners were to be appointed for each municipal township. That act being subject

to such a construction as would give the township commissioners control of the village lots reserved for school purposes under the Act of Congress of 1812, the General Assembly passed an act supplementary thereto, approved February 16, 1825, Revised Statutes 1825, p. 720, forbidding that construction and forbidding also the appropriation of the proceeds arising from the sale of those lots to any other purpose than the support of schools "in the respective towns and villages to which such town or village lots, out lots, or common field lots, shall have belonged." That was the law in 1833 when the act of that date was passed under which plaintiff claims title, or claims rather the right to sell or dispose of lots to which it claims it already had title, and to appropriate the proceeds as the trustees might see fit for the benefit of the inhabitants of the town. To give the Act of 1833 the construction plaintiff contends for we would have to say that the General Assembly was not only unmindful of the provision of the Constitution above quoted, but forgetful also of its own acts of January 17 and February 16, 1825, to which it made no reference in the Act of 1833, and forgetful also of the trust reposed in it by the Act of Congress of 1831.

In the abstract it is said that the plaintiff offered in evidence a certificate copy of the record of "Incorporation of the inhabitants of the town of Carondelet," but there is no abstract of the charter and therefore the record does not show whether in that charter any disposition of these school lots is made. But in 1851, Laws 1851, p. 139, the General Assembly incorporated the city of Carondelet, and in section 2 of article 8 of that charter it is provided that the property in all lands granted, for the benefit of schools, to the inhabitants of the town or village of Carondelet, by any act of Congress, is hereby vested in the corporation created by this act. And further in the same section it is made the duty of the city council to obtain pos-

session of the lands ''and when in possession thereof, to hold the same to the use of such schools.'' But plaintiff in this suit is not claiming title under that provision of the charter of Carondelet; if it should so claim, it would have to assume the capacity of trustee for the schools in Carondelet, and it would have to confess that the contract with the Lewis Iron Company, which we will presently consider, and the so called compromise deeds, were all illegal. Plaintiff claims now that these school lots, by virtue of acts of Congress above mentioned and the Act of the General Assembly of 1833, became the property of Carondelet in its own right and for its own use. That claim is not sustained.

In whatever capacity the plaintiff might assert title to a lot based on the fact that it was one of the lots reserved for school purposes in the Act of 1812, the burden of proving that fact would be on the plaintiff, that is, proving that it was in fact a vacant, uninhabited and uncultivated lot on the twentieth day of December, 1803. Plaintiff produced no such proof in this case.

In so far as the plaintiff's claim of title rests on the claim of fact that block 12 of Eiler's map was one of the village lots reserved in the Act of 1812 for school purposes, it is without proof to sustain it. The Act of 1824 required the Surveyor-General under the instructions of the Commissioner of the General Land Office, to survey, designate and set apart to the towns and villages, respectively, the vacant village lots, out lots and common field lots reserved in the Act of 1812 for school purposes. If any such survey and plat were ever made as to Carondelet they were not produced in evidence; Brown's Survey of 1834 does not show those facts. We do not mean to say that if such a survey and plat had been made they would have been evidence against individuals whose claims were confirmed by the Board of Commissioners. The record

of the Board of Commissioners confirming individual claims was public and plaintiff could have availed itself of the evidence there afforded to show what lots had been confirmed to individuals.

We hold that there is nothing in any of the acts of Congress or in the surveys shown in evidence or in the Act of the General Assembly of 1833 that confers title in the inhabitants of the village or in the after-incorporated town of Carondelet to the land in dispute in this case.

III.   Plaintiff introduced in evidence a certified copy of what is called Eiler's map or plat of the town of Carondelet made in 1832, on which appears between the riparian lots and the river what is designated as "Towpath or Water Street." There is no evidence by what authority Eiler's survey was made and nothing shown to connect the defendant or those under whom it claims with it.  There is no evidence to show when the strips so marked ceased to be called a towpath and began, if ever, to be called "Water Street." There is no evidence of any dedication of the land covered by the towpath to the public or that it was ever improved as a street.

In the confirmation by the commissioners of the lots to the individuals under whom defendant claims, the lots were described as "bounded east by the Mississippi river, leaving space for a tow." Plaintiff contends that that mention of the tow limits the confirmation, for its east boundary, to the towpath, that the land covered by the towpath thereby became the property in fee of the village of Carondelet, and the land in dispute is an accretion to land covered by the towpath.  That contention rests on a misconception of the nature of a towpath.  Going back to the early period in which the respective claims to this land arose, we take judicial notice of what a towpath was as then used and applied to land fronting the Mississippi river.  A towpath was an appurtenance to the

navigation of the river; the right to it belonged in no sense to the inhabitants of the village as such, but to all people engaged in towing boats on the river. It was "a path traveled by men or animals towing boats." [Webster.] It was a public necessity in those early days before the introduction of boats propelled by steam, but the necessity ceased when steam boats came; it has long since ceased as a fact to exist in the locality shown by Eiler's map. Even in those days the towpath was not a fixed locality, like a street in a town or village, but it shifted as the banks of the river changed and as the water rose or fell. Title to the land occupied did not vest in the public, the right to use it as a path for towing water craft was but an easement and ceased when the use ended, the title to the land remained all the while in the riparian owner. Plaintiff has no right to the land in question on the theory that the town of Carondelet owned the land occupied by the towpath.

IV. Plaintiff claims that defendant as owner of the east half of block 12 has no right to the land in dispute because it holds under those who acquired title from Carondelet under deeds which gave Front street as the eastern boundary of the land conveyed. But even if that were so it would not avail the plaintiff in this suit, because in an action of ejectment a plaintiff must recover if at all on the strength of his own title, not on the weakness of that of the defendant. If it were true therefore that defendant holds possession under deeds that limit the grants to Front street on the east, that might be a defect in defendant's title, but not a merit in plaintiff's.

Defendant disputes the proposition that it holds possession under the deeds referred to which bound the land on the east by Front street, and it offered evidence at the trial showing other deeds under which it claims and which call for the river as the eastern boundary of the land.

V. A deed from the Lewis Iron Company to the Missouri Furnace Company is one of the deeds in the course of defendant's title. The plaintiff introduced a contract between the city of Carondelet and the Lewis Iron Company dated August 30, 1869, by which the Iron Company agreed to build and put in operation machinery, for smelting ore and manufacturing pig iron, at a cost not less than $100,000 and in consideration thereof the city granted to the Iron Company for the term of 25 years from date the land lying between the east line of block 12 and 13 "including the exclusive use of the towpath, or Front street and the wharf between said two streets." The city also agreed to exempt from taxation for ten years from 1870 the east half of block 12 and 13. That contract was not a link in defendant's chain of title, nor was it introduced in evidence by the defendant. The Lewis Iron Company already had deeds from persons who defendant claims derived title from confirmation by the Board of Commissioners under the acts of Congress. The 25 years which covered the contract between Carondelet and the Lewis Iron Company expired August 30, 1894, and the defendant purchased from McNair and De Camp, July 26, 1900. The contract had expired before the defendant become connected with the property. It does not appear from the evidence that either the possession of defendant or the title claimed by it was derived under the contract between Carondelet and the Lewis Iron Company, therefor defendant is not a tenant of the plaintiff and is not estopped to deny the plaintiff's title.

Our conclusion is that the plaintiff has shown no title to the land in suit, therefore there is no necessity for considering the evidence on which the defendant's title depends; that was the view taken by the learned trial judge and it was correct. The judgment is affirmed. All concur.